1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

9

10    STATE OF WASHINGTON,                          NO.

11                          Plaintiff,              COMPLAINT FOR DECLARATORY,
                                                    INJUNCTIVE, AND OTHER RELIEF
12            v.

13    ALDERWOOD SURGICAL CENTER,
      LLC, a Washington limited liability
14    company; NORTHWEST NASAL SINUS
      CENTER P.S., a Washington professional
15    service corporation; and JAVAD A. SAJAN,
      M.D.,
16
                            Defendants.
17

18          Plaintiff State of Washington, by and through its attorneys Robert W. Ferguson,

19    Attorney General, and Matt Geyman, Camille McDorman, and Zorba Leslie, Assistant Attorneys

20    General, brings this action against Defendant Alderwood Surgical Center, LLC, d/b/a Allure

21    Esthetic, d/b/a Gallery of Cosmetic Surgery, d/b/a Seattle Plastic Surgery, and Defendant

22    Northwest Nasal Sinus Center P.S., d/b/a Northwest Face & Body (collectively, "Allure

23    Esthetic"), and their owner, Defendant Javad A. Sajan, M.D. The State alleges that Defendants

24    have engaged, and continue to engage, in a pattern of unlawful, unfair, and deceptive acts or

25    practices in violation of the Consumer Review Fairness Act, 15 U.S.C. § 45b (CRFA), the Health

26    Insurance   Portability   and   Accountability   Act,   42   U.S.C.   § 1320d-5(d)   and

COMPLAINT FOR DECLARATORY,                                    ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE, AND OTHER RELIEF - 1                                     Consumer Protection Division
                                                                     800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA 98104-3188
                                                                          (206) 464-7744

45 C.F.R. § 164.508(b)(4) (HIPAA), and the Washington Consumer Protection Act, Wash. Rev. Code § 19.86 (CPA). The State alleges the following on information and belief:

## I.   INTRODUCTION

1.      With the ever-increasing reliance on online marketing, ensuring that online reviews are truthful and that consumers can freely share accurate information about businesses is essential to protecting Washington consumers and maintaining fair business competition.

2.      This is even more crucial in certain industries, such as the plastic and cosmetic surgery business, where online reviews are often a consumer's primary or only source of third-party information about a healthcare provider before trusting that provider with sensitive, and in some cases life-altering, procedures.

3.      State and federal consumer protection laws prohibit businesses from unfairly or deceptively manipulating consumer reviews. For instance, Congress, recognizing a need for further protections in this increasingly important area, passed the Consumer Review Fairness Act, 15 U.S.C. § 45b, which prohibits the use of "gag clauses" in form contracts that prevent, restrict, or suppress truthful consumer reviews.

4.      Allure Esthetic is a large, highly profitable Seattle-area plastic and cosmetic surgery business with offices in Lynnwood, Kirkland, and Seattle. Allure Esthetic does business under several names, including Allure Esthetic, Alderwood Surgical Center, Gallery of Cosmetic Surgery, Seattle Plastic Surgery, Northwest Nasal Sinus Center, and Northwest Face & Body.

5.      Allure Esthetic is owned and controlled by Defendant Javad A. Sajan, M.D., a plastic surgeon who advertises online, including on Instagram, Facebook, YouTube, Snapchat, and other social media, as @realdrseattle or "Real Dr. Seattle."

6.      Defendants systematically suppressed negative patient reviews by requiring their patients, before they received services (and in some cases before even having a consultation), to sign a form nondisclosure agreement (the pre-service NDA) that purported to restrict the patient's right to post truthful information about their experience with Defendants' services.

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 2

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

7.  Specifically, from August 15, 2017 to March 24, 2022, Defendants used a pre-service form NDA to restrict patients from posting negative online reviews of Defendants' plastic and cosmetic surgery services in violation of the CRFA, 15 U.S.C. § 45b, and the CPA, Wash. Rev. Code § 19.86. Defendants required over 10,000 patients to sign these illegal NDAs over that period.

8.  A version of the pre-service NDA Defendants used from August 15, 2017 to January 11, 2019 also required Defendants' patients to agree that if they left a negative review in violation of the agreement, Defendants could unilaterally reveal their personal health information ("PHI") when responding to the review, in violation of HIPAA, 45 C.F.R. § 164.508(b)(4).

9.  When patients posted negative reviews despite the pre-service NDA, Defendants contacted them and used the pre-service NDA—and the threat, or implied threat, of taking legal action to enforce it—to coerce them into taking down the negative reviews.

10.  Beginning in September 2017, Defendants also used a second, post-service NDA that prohibited patients from posting negative reviews after they received services. When a patient posted a negative review despite the pre-service NDA, Defendants offered the patient cash, free services, and/or free products "to make things right."

11.  After a patient accepted Defendants' offer of cash or other inducement "to make things right," Defendants then required the patient to sign the post-service NDA to receive the inducement payment—an additional condition not previously disclosed.

12.  This post-service NDA illegally forced consumers to remove their reviews and purported to prohibit them in perpetuity from posting reviews of any kind or ever discussing Defendants' business with anyone. Defendants required hundreds of patients to sign these illegal post-service NDAs.

13.  Defendants' illegal NDAs restricted their patients from sharing truthful information about Defendants' services with the public and prevented other Washington

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 3

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  consumers from having access to accurate, complete information when shopping for health
2  care services.

3       14.     Defendants' illegal NDAs deceived, or had the capacity to deceive, patients into
4  believing the NDAs were valid and enforceable, when in fact they are against public policy,
5  unenforceable, and void under the law.

6       15.     Defendants' NDAs further deceived, or had the capacity to deceive, tens of
7  thousands of Washington consumers who were in the market for plastic and cosmetic surgery
8  services and saw Defendants' advertising, but did *not* see negative reviews of Defendants that
9  were prohibited or suppressed by the illegal NDAs.

10      16.     In addition these violations involving Defendants' NDAs, since 2016, Defendants
11 further misled their patients and the public through a multitude of other unlawful, unfair, and
12 deceptive practices, including:

13          a)  Creating fake positive reviews on Google, Yelp, and other review sites using fake
14              email accounts and fictional online personas;

15          b)  Buying tens of thousands of fake "followers" on Instagram and thousands of fake
16              "likes" on Instagram and other social media to create a false appearance of
17              popularity for advertising to consumers;

18          c)  Making deceptive digital alterations to "before and after" photos and using the
19              altered photos to advertise on Instagram and other online media to make the results
20              of surgery and other cosmetic services look better than they actually were; and

21          d)  Misappropriating cash rebates that Allure Esthetic's patients earned under a
22              customer loyalty program.

23      17.     Defendants' conduct violates the CRFA, HIPAA, and the CPA. Through these
24 illegal NDAs and other unlawful, unfair, and deceptive acts, Defendants suppressed negative
25 information about Allure Esthetic and Dr. Sajan, and deceived their patients and thousands of other
26 Washington consumers who were deprived of access to truthful information about Defendants,

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 4

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    while gaining an unfair competitive advantage over competing businesses that play by the rules.

2       18.    The State, therefore, brings this case to void these illegal and harmful NDAs that

3    Defendants unlawfully procured and used to restrict patients from posting negative reviews;

4    permanently enjoin Defendants from engaging in the illegal, unfair, and deceptive practices

5    described herein; obtain restitution for Washington consumers and civil penalties as provided by

6    statute; and recover the State's reasonable attorneys' fees and costs incurred in this matter.

7                              **II.    JURISDICTION AND VENUE**

8       19.    This Court has subject matter jurisdiction over this action because the State's

9    claims arising under the CRFA, 15 U.S.C. § 45b, and HIPAA, 42 U.S.C. § 1320d-5(d)(1),

10   present federal questions. 28 U.S.C. § 1331.

11      20.    The Court has supplemental jurisdiction over the State's state law CPA claims

12   because those claims are integrally related to the State's federal law claims and are part of the

13   same case or controversy. 28 U.S.C. § 1367(a).

14      21.    Venue is proper because Defendants reside and do business in this district, their

15   principal place of business is located in this district, and a substantial part of the events giving

16   rise to the State's claims occurred in this district. 28 U.S.C. § 1391(b), (c).

17      22.    The CRFA authorizes state attorneys general to enforce the CRFA in district court

18   and to secure the remedies provided therein. 15 U.S.C. § 45b(e)(1). The CRFA requires the

19   Attorney General to provide prior written notice to the Federal Trade Commission, which the

20   State has done. *See* 15 U.S.C. § 45b(e)(2)(A).

21      23.    The Health Information Technology for Economic and Clinical Health Act

22   (HITECH) authorizes state attorneys general to enforce HIPAA's privacy provisions in district

23   court, and to secure the remedies provided therein. 42 U.S.C. § 1320d-5(d)(1). The HITECH Act

24   requires the Attorney General to provide prior written notice to the Secretary of Health and

25   Human Services, which the State has done. *See* 42 U.S.C. § 1320d-5(d)(4).

26

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 5

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

### III.   PARTIES

24.     Plaintiff is the State of Washington, acting by and through the Consumer Protection Division of the Washington Attorney General's Office.

25.     Defendant Alderwood Surgical Center, LLC, d/b/a Allure Esthetic, d/b/a Gallery of Cosmetic Surgery, d/b/a Seattle Plastic Surgery is a Washington limited liability company whose principal place of business is located at 3500 188th Street SW, Suite 670, Lynnwood, WA 98037.

26.     Defendant Northwest Nasal Sinus Center P.S., d/b/a Northwest Face & Body is a Washington professional service corporation whose principal place of business is located at 3100 Carillon Point, Kirkland, WA 98033.

27.     Defendant Javad A. Sajan, M.D. is an individual residing in King County, Washington. Dr. Sajan is the owner of both Defendant Alderwood Surgical Center, LLC, which he acquired in 2016, and Defendant Northwest Nasal Sinus Center P.S., which he acquired in 2020.

28.     Defendants Alderwood Surgical Center, LLC, Northwest Nasal Sinus Center P.S., and Dr. Sajan, and each of them, knowingly assisted, directed, controlled, participated in, and/or approved of the acts, practices, and activities that are the subject of this Complaint, and did so at all times material hereto.

### IV.   FACTS

**A.     Consumer Reviews Are Essential to a Fair and Reliable Marketplace**

29.     Accurate, reliable reviews are vitally important to consumers throughout the economy, including consumers of health care services such as the plastic and cosmetic surgery services that Defendants offer.[1]

---

[1] *See, e.g.*, Consumer Financial Protection Bureau Bulletin 2022-05, *Unfair and Deceptive Acts or Practices that Impede Consumer Reviews* (March 28, 2022) (discussing importance of consumer reviews), *available at* https://www.federalregister.gov/documents/2022/03/28/2022-06446/bulletin-

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

30.     Consumers rely on accurate and authentic reviews to inform their purchase decisions. Sites such as Google and Yelp reviews play a major role in informing consumers about both the good and bad features of doing business with various local companies. Deceptive reviews harm consumers by providing misleading and/or distorted information about the quality of the goods or services being offered.

31.     When a business restricts consumers from sharing truthful negative reviews of the business, it prevents other consumers from obtaining information they need to choose among competing businesses. Such tactics distort the market for the services or goods under review and undermine fair competition.

32.     In the health care context, consumer reviews allow patients to share experiences, both positive and negative, relating to the quality of services and care, punctuality, staff friendliness, and other factors that matter to patients when choosing a health care provider.

**B.     Defendants Know How Important Online Reviews Are to Their Patients**

33.     Defendants know how important online reviews of Defendants' services are to their patients, and their website, patient intake form, and internal communications make that clear.

34.     On their website, Defendants have sought to attract consumers by advertising that they have a "5 star" rating on Google and Yelp:

---

2022-05-unfair-and-deceptive-acts-or-practices-that-impede-consumer-reviews; Y. Alicia Hong, et al., *What Do Patients Say About Doctors Online: a Systematic Review of Studies of Patient Online Reviews*, Journal of Medical Internet Research 21(7) (July 2019) ("The growing body of literature on PORs [patient online reviews] indicates its increasing importance in patients' decision making), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6475821/.

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 7

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744



 

35.     Defendants' patient intake questionnaire also shows Defendants' understanding of the importance of online reviews to their customers by asking consumers to check a box indicating whether they learned about Defendants from Yelp or Google:

> How did you hear about us?          Google        Yelp        Referral
>                     Other:
>
> Have you been to our website?
> _____

36.     On July 5, 2018, one of Allure Esthetic's estheticians sent an email to Dr. Sajan apologizing for a negative review, and stated, "I know how crucial reviews are for your business."

37.     Similarly, on August 16, 2021, one of Defendants' patient care coordinators emailed Allure Esthetic's CEO and COO to apologize for a patient's negative review and stated, "I'll try to get more positive reviews going forward."

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 8

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**C.    Defendants Used Illegal Pre-Service NDAs to Restrict Negative Reviews**

38.    In recent years, Allure Esthetic's primary tactic to prevent negative patient reviews has been to require new patients to sign NDAs restricting their ability to post truthful information on review sites like Google and Yelp.

39.    Suppressing negative reviews, and taking steps to remove them after they are posted, is a central focus of Defendants' business strategy.

40.    From August 15, 2017 to March 24, 2022, Defendants required all patients to sign a pre-service form NDA containing standardized terms that restricted patients from posting negative reviews of Defendants online.

41.    Defendants required all patients to sign the pre-service NDA. If a patient refused to sign it, Defendants refused to provide a consultation or other services to the patient.

42.    For Dr. Sajan, Allure Esthetic required patients to pay a $100 consultation fee before their consultation appointment. Allure Esthetic advertised the consultation, including the $100 fee for Dr. Sajan, on its website. It did not disclose, however, that when patients came in for a scheduled consultation with Dr. Sajan after paying the fee, they would not receive the consultation unless they also signed the pre-service NDA.

43.    When patients declined to sign the pre-service NDA, they were told that the $100 consultation fee was non-refundable.

44.    Prospective patients often resisted signing the pre-service NDA but most ultimately agreed because they had paid the $100 consultation fee and did not want to forfeit the fee.

45.    Allure Esthetic employed staff members whose responsibilities included ensuring that patients signed the pre-service NDA. Defendants instructed such staff to take patients into a conference room if the situation became heated over the patient's refusal to sign the pre-service NDA.

46.    Defendants began using the pre-service NDA on August 15, 2017. The first version, which they used for one week, was entitled "Negative Reviews" and required patients

to agree that if they were unhappy with the services they received from Defendants, they would not leave a negative review. It stated that a "negative review" is anything less than 4 stars and any negative comment, and required patients to agree that "[i]f I leave a negative review without contacting a representative of the practice and allowing them to resolve the issue, I give permission and allow a response [to the review] from the practice with my personal health information and agree to pay a $250,000 fine." *See* Exhibit A (attached hereto and incorporated by reference; consumer information redacted).

47.     The next version of Defendants' pre-service NDA, which they used from August 22, 2017 to January 11, 2019, was still entitled "Negative Reviews." It restricted patient reviews by requiring patients to notify Defendants and allow them to try to resolve any concerns *instead of* posting a negative review. This version of the NDA still required Defendants' patients to agree that if they left a negative review in violation of the NDA, Defendants could use their personal health information when responding to the review, and the patient would pay monetary damages to the practice for any losses. *See* Exhibit B (attached hereto and incorporated by reference; consumer information redacted).

48.     From January 11, 2019 to March 24, 2022, Defendants used a third version of the pre-service NDA, entitled "Mutual Nondisclosure Agreement." Defendants' third version was similar to the other two and continued to restrict patients from posting negative reviews, but it no longer provided that Defendants could disclose patients' personal health information if they violated the agreement, and no longer referred to money damages. *See* Exhibit C (attached hereto and incorporated by reference).

49.     Defendants' pre-service NDA, in each of its versions, was an adhesive, take-it-or-leave it form agreement that Defendants used in the course of selling their goods and services, and they required their patients to sign the pre-service NDA form without any meaningful opportunity to negotiate its nondisclosure terms.

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

50.     Defendants' use of the pre-service NDA from August 15, 2017 to March 24, 2022 also violated Yelp's terms of service, which expressly required Defendants to comply with the CRFA and prohibited Defendants from using "gag clauses" that restrict consumers from posting negative reviews.

51.     When they accepted and agreed to Yelp's terms of service, Defendants represented that they "understand and acknowledge that non-disparagement clauses in certain consumer contracts, such as clauses that seek to restrict or prohibit reviews (including provisions that penalize consumers for posting reviews) about your Business, are illegal under . . . the federal Consumer Review Fairness Act (15 U.S.C. § 45b) and you agree that you will not include such clauses in your consumer contracts, or otherwise attempt to enforce non-disparagement or 'gag' clauses against consumers under any circumstances."[2]

52.     Defendants did not abide by this agreement. Defendants were also warned about the CRFA and knew, or should have known, that their use of these pre-service NDAs violated the CRFA no later than November 25, 2019, when their in-house legal counsel received an email from the General Counsel of RealSelf, a review site, that asked whether "Allure uses some sort of 'no negative reviews' or non-disclosure agreement with its patients," and again specifically referred to the "Consumer Review Fairness Act."

53.     Despite their knowledge of the CRFA and its requirements, Defendants continued using their illegal pre-service NDAs for more than two additional years, until March 2022.

54.     Defendants also knew, or should have known, that the pre-service NDA forms they used from August 15, 2017 to January 11, 2019 violated HIPAA, 45 C.F.R. § 164.508(b)(4), by requiring patients to agree that Defendants could disclose their private health information in responding to an online review if the patient did not follow the review policy.

---

[2] *See* Yelp, *Terms of Service*, "Additional Terms for Business Accounts" (eff. Jan. 31, 2020), *available at* www.terms.yelp.com/tos/en_us/20200101_en_us/ (requiring agreement to comply with CRFA); Yelp, *Terms of Service*, "Additional Terms for Business Accounts" (eff. Apr. 30, 2019), *available at* www.yelp.com/static?p=tos_archived_2019 (same).

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 11

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

55.     On February 20, 2019, Defendants' in-house legal counsel acknowledged in an email to the U.S. Department of Health and Human Services that responding to an online review with specifics about a patient "would have us in violation of HIPAA requirements."

56.     Yet, just one month earlier, Defendants' pre-service NDA required an advance waiver of patients' right to keep their personal health information private if they posted a negative review without first contacting Defendants and allowing them to resolve the issue.

57.     On May 24, 2021, in response to a consumer complaint filed by one of their patients regarding Defendants' NDA practices, Defendants sent a letter to the Washington Attorney General's Office claiming that "[a]t all times and through the course of this matter Allure has complied with HIPPA [*sic*] regulations."

58.     In the same letter to the Attorney General's Office, which pre-dated the State's investigation in this matter, Defendants also claimed that "there is nothing that suggests that Allure is prevented by law or public policy from using non-disclosure agreements to protect its business interests."

59.     At least one of Defendants' patients wanted to post a negative review of Defendants but refrained from doing so because they signed the pre-service NDA.

60.     Another patient posted a negative review about their experience with Defendants only to take it down shortly thereafter out of fear of retaliation because of the pre-service NDA.

61.     A patient who scheduled a consultation with Dr. Sajan stated in a complaint to the Attorney General's Office, "I'm greatly troubled by the practice of forcing patients to sign a NDA before they even see the doctor. . . . [I]t seems like possible fraud or extortion if their reviews are coerced or paid for and not honest experiences that consumers can use to make informed decisions."

62.     Based on records obtained from Defendants, the State estimates that from August 15, 2017 to March 24, 2022, Defendants required at least 10,000 patients to sign pre-service NDA forms.

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 12

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**D.    Defendants Used Illegal Post-Service NDAs to Prohibit Negative Reviews**

63.    In addition to Defendants' use of the pre-service NDAs to suppress negative reviews, since September 2017, Defendants have also used a second type of NDA that requires patients to agree to take down negative reviews after they are posted and to refrain from posting any reviews of Defendants in the future (the "post-service NDA").

64.    Defendants regularly monitor consumer reviews on Google, Yelp, and other review sites to identify negative reviews as soon as they are posted.

65.    When they find a negative review, Defendants typically offer the disgruntled patient cash payments, free services, and/or free products "to make things right."

66.    Only after a patient accepts the inducement offered "to make things right," Defendants then require them to sign the post-service NDA to receive the inducement payment— as an additional condition not previously disclosed.

67.    Defendants' post-service NDA is a form agreement containing standardized terms entitled "Refund, Release, Settlement and Nondisclosure Agreement." Paragraph 4 of the form is entitled "Non-Disclosure Agreement," and requires patients to agree to remove and delete any and all negative reviews previously posted and to refrain from posting any negative reviews in the future. Paragraph 5 of the form is entitled "Breach" and provides that if patients violate the terms of this second NDA they must pay Defendants "$250,000 total or $10,000 per day" for every day the patient remains in violation. *See* Exhibit D (attached hereto and incorporated by reference; consumer information redacted).

68.    Defendants' post-service NDA prohibits patients from posting negative reviews of Defendants "through any medium, either orally or in writing, including, but not limited to, Facebook, Instagram, LinkedIn, Snapchat, Yelp, Google, and Twitter, or any other form of communication." *Id*.

69.    Defendants' post-service NDA is an adhesive, take-it-or-leave it form that Defendants used and continue to use in the course of selling their goods and services, and they

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 13

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

require their patients to sign the post-service NDA form without any meaningful opportunity to negotiate its nondisclosure terms.

70.     Defendants' use of the post-service NDA from September 2017 to the present to require patients to remove negative reviews in return for Defendants' offers of cash, free services, and other incentives also violated Yelp's terms of service, which prohibited Defendants from offering incentives or inducements of any kind to consumers to prevent or remove negative reviews.

71.     When they accepted and agreed to Yelp's terms of service, Defendants represented and warranted that they "will not, and will not authorize or induce any other party, to offer incentives of any kind . . . to prevent or remove reviews."[3] Defendants did not abide by this agreement.

72.     Based on records obtained from Defendants, the State estimates that since September 2017, Defendants have required hundreds of patients to sign their post-service NDA.

**E.     Defendants Used NDAs and Illegal Threats to Force Patients to Remove Reviews**

73.     Defendants engaged in a pattern and practice of actually or implicitly threatening litigation in order to coerce their patients into removing negative reviews.

74.     Defendants instructed employees to call patients who posted negative reviews, sometimes calling them at their workplaces, and ask them to take down the review, reminding them that they had signed the NDA.

75.     If patients refused to take down the review, Defendants would increase threats of legal action and involve Allure Esthetic's attorneys.

76.     Defendants conveyed threats or implied threats of litigation to patients over the telephone, and on some occasions, their attorneys sent patients demand letters that referenced the NDAs and threatened litigation if patients did not remove their negative reviews. Defendants'

---

[3] *See* footnote 2, above.

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 14

1  employees had regular meetings to review the current negative reviews and what steps

2  employees were taking to get them removed.

3       77.     Dr. Sajan's former assistant testified that Allure Esthetic's efforts to remove

4  negative reviews were "relentless," as they would "track[ ] the patients . . . down and either

5  threaten[ ] them to take the negative reviews down or offer[ ] money like bribes and stuff."[4]

6       78.     In instances when Allure Esthetic could not identify the patient name from the

7  review itself, Defendants would file a defamation lawsuit against the anonymous person who posted

8  the review, then use that litigation to subpoena the review site, such as Google, to get the reviewer's

9  Internet Protocol (IP) address and track down the patient.

10      79.     Defendants also sued nine anonymous defendants in Snohomish County in 2018

11  and 2019 for defamation for posting negative reviews. Defendants did not pursue the merits of

12  these lawsuits after filing them, and did not prevail on the merits in any of them.[5] Instead,

13  Defendants used the court process to issue multiple third-party subpoenas to determine the

14  reviewer's identity.

15      80.     At team meetings, Defendants' in-house legal counsel regularly would present an

16  Excel spreadsheet containing updates on their progress in getting patients to remove negative

---

17
18      [4] Unless otherwise noted, quotations attributed to witnesses in this complaint are taken from
       sworn deposition testimony or declarations obtained by the State in the course of its investigation into
19     Defendants' conduct.

20      [5] *See Javad Sajan d/b/a Alderwood Surgical Center v. Sara Smith*, Snohomish Cty. Super. Ct.
       No. 19-2-10930-31 (Dec. 9, 2019) (Google review); *Javad Sajan d/b/a Alderwood Surgical Center v.*
21     *Jessica Albez*, Snohomish Cty. Super. Ct. No. 19-2-10929-31 (Dec. 9, 2019) (Google review); *Javad*
       *Sajan d/b/a Alderwood Surgical Center v. Sam Roberts*, Snohomish Cty. Super. Ct. No. 19-2-07095-31
22     (Aug. 7, 2019) (Google review); *Javad Sajan d/b/a Alderwood Surgical Center v. Jake a/k/a Jake Doe*,
       Snohomish Cty. Super. Ct. No. 19-2-04063-31 (May 5, 2019) (Yelp review); *Javad Sajan d/b/a*
23     *Alderwood Surgical Center v. Kristin M a/k/a Jane Doe*, Snohomish Cty. Super. Ct. No. 19-2-03059-31
       (Apr. 5, 2019) (Google review); *Javad Sajan d/b/a Alderwood Surgical Center v. Mar*, Snohomish Cty.
24     Super. Ct. No. 19-2-02059-31 (Mar. 7, 2019) (Yelp review); *Javad Sajan d/b/a Alderwood Surgical*
       *Center v. Via*, Snohomish Cty. Super. Ct. No. 19-2-02058-31 (Mar. 7, 2019) (Google review); *Javad*
25     *Sajan d/b/a Alderwood Surgical Center v. J. Doe*, Snohomish Cty. Super. Ct. No. 19-2-01776-31 (Feb.
       28, 2019) (Google review); *Javad Sajan d/b/a Alderwood Surgical Center v. Brenda Chester*, Snohomish
26     Cty. Super. Ct. No. 18-2-03444-31 (Apr. 16, 2018) (Google review).

reviews. Dr. Sajan would then give feedback and direct next steps.

81.     Dr. Sajan personally authorized the amount of cash or value of goods that were offered to patients who posted negative reviews as incentives to remove the reviews.

82.     When Defendants saw that a negative review had been posted, Defendants regularly instructed employees to immediately flag the negative review as spam so that the review site would remove it.

83.     In multiple instances, Defendants instructed their employees to write and post fake positive reviews of Defendants' practice so that negative reviews would appear farther down when consumers viewed the webpage.

## F.     Defendants Created Fake Positive Reviews Using Fake Email Accounts and Fictional Online Personas

84.     Truthful reviews provide a forum for sharing authentic feedback so consumers can make informed decisions about the services and products they use. Fictitious reviews distort the market. They are also illegal.[6]

85.     Defendants deliberately created and posted fake positive reviews using fake email accounts and fictional online personas to impersonate actual consumers.

86.     Defendants initially engaged third parties through the online forum BlackHatWorld.com to create fake email accounts and to post fake reviews.

87.     In their responses to the State's investigation, Defendants admit that prior to 2019, they hired a third-party contractor to whom they "delegated . . . full authority to manage Alderwood's [*i.e.*, Allure Esthetic's] online presence, including access to Alderwood's devices via

---

[6] *See* Federal Trade Commission, 16 C.F.R. Part 255, *Guides Concerning the Use of Endorsements and Testimonials in Advertising* (2009) ("Endorsements must reflect the honest opinions, findings, beliefs, or experience of the endorser"); *see also* PEW Research Center, *States Take Key Role in Fighting Fake Online Reviews* (Dec. 2, 2022), *available at* www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2022/11/17/states-take-key-role-in-fighting-fake-online-reviews?amp=1.

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  a virtual desktop software." On information and belief, Defendants' third-party contractor was

2  Dr. Sajan's cousin.

3       88.     Defendants admit that prior to 2019, this third-party contractor "may have obtained

4  reviews for Alderwood."

5       89.     By 2018, at the direction of Dr. Sajan, Defendants' employees developed their

6  own in-house scheme to curate fake online personas for the purpose of posting fake reviews of

7  Defendants' services.

8       90.     Defendants admit that in 2018, they hired a web designer and digital marketing

9  specialist who they tasked with developing their marketing program and online presence, and who

10  "may have written reviews, and posted reviews" that were fake on behalf of Defendants.

11       91.     Defendants' former in-house legal counsel admitted that "I knew that employees

12  were creating reviews."

13       92.     At the direction of Dr. Sajan, Defendants' employees created Gmail accounts using

14  stock photos for their profile pictures. Over the course of several months, the employees would use

15  those accounts to post fake reviews of various businesses around the same Seattle geographic area

16  for the purpose of eluding detection by online review platforms. The employees would then use

17  those accounts to post online reviews of Allure Esthetic and Dr. Sajan by posing as real patients.

18       93.     One of Defendants' former web designers testified to the process: "So when we

19  curated the accounts, we would review, like Pennzoil Oil change or Applebee's as positive reviews

20  just to be able to show that it was a real person or to make it look like it was a real person with the

21  sole purpose of curating that account to look like a real person and to then leave a positive review

22  for one of three surgical centers owned by Dr. Sajan."

23       94.     A second former web designer provided a similar description in an investigative

24  deposition: "So he [Dr. Sajan] also wanted me to do the reviews, like Google reviews. So I had to

25  come up—I had to build these personas. And what a persona is basically a little brief bio of a person

26  that you're trying to target as an audience, you know, a single—single male with one job, two kids,

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 17

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   you know, one dog. So you would build these little personas so that when you would build the

2   review, you have—you pretend you're that person, and it's a lot easier to write the review."

3       95.     The same former web designer testified that he believed Defendants' practice of

4   creating and posting fake positive reviews was unethical.

5       96.     The web designer testified that he specifically told Dr. Sajan that creating fake

6   positive reviews was unethical and that he was no longer going to do it, and that Dr. Sajan told him

7   not to worry and he would get someone else to do so.

8       97.     Dr. Sajan provided specific instructions to Defendants' employees regarding the

9   terminology, descriptions of services, and other content to be used in fake reviews. Dr. Sajan

10  specifically reviewed and provided feedback on the content of fake reviews.

11      98.     Defendants' former web designer testified that Defendants' emphasis on the

12  terminology used in fake reviews was to "make sure it was realistic and that it had SEO value" to

13  improve the ranking of reviews in search engines.

14      99.     SEO, or search engine optimization, is the process of improving the quality and

15  quantity of website traffic to a website or a web page from search engines, including through the

16  selective use of keywords and phrases.

17      100.    Based on the keywords and phrases in the following Google reviews, the former

18  web designer testified that he believes that the following are two examples of fake Google reviews

19  he created and posted at the direction of Dr. Sajan:

20  
    **Priscilla Mayberry**
21  2 reviews

22  ★★★★★  4 years ago
    I have always been self-conscious of my nose since I was young. I was hesitant to get a nose job
23  because it wasn't that bad. I learned about Non-Surgical Rhinoplasty from Dr. Sajan and decided to give
    it a try.

24  I was a bit skeptical because it was inexpensive and took less than an hour but WOW!!! All my friends
    thought I had nose surgery. They results are amazing. Thanks Dr. Sajan!

25  👍 1

26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744



**Kareena Martinez**
1 review

★★★★★  4 years ago

I went to Dr. Sajan and was EXTREMELY happy with my Breast augmentation results! I highly recommend going to Allure Esthetic! Dr. Sajan also has the best staff you could ever ask for. I was nervous for surgery and the nurses and anesthesiologists really made me feel relaxed and excited! Add them on Instagram and Snapchat and see for yourself!

 Like

101.    Defendants used a Virtual Private Network (VPN) service called HideMyAss! (www.hidemyass.com) to disguise the IP addresses from which these fake reviews originated, for the express purposes of concealing the actual source and continuing the deception.

102.    Defendants' former web designer testified that the "main reason" Defendants used a VPN "was if we were doing something we weren't supposed to, it wouldn't show that it was done in the location we were actually doing it, which was usually the Allure Esthetic office in Lynnwood."

103.    The former web designer further testified, "[w]henever we were to do something that was immoral or illegal, we would sign into the VPN . . .  And then when we were done, we would sign off of the VPN."

104.    Defendants used this VPN service to deceive not only the public, but also review websites.

105.    Defendants' former web designer confirmed in deposition testimony that Defendants used the VPN service "so the Google reviews wouldn't get flagged as false."

106.    Defendants' HideMyAss! subscription was registered to Dr. Sajan's personal Gmail address and paid for using his personal PayPal account.

107.    Before Defendants began using HideMyAss! to hide the IP addresses from which they posted fake reviews, they purchased other fake reviews that failed to disguise the IP addresses.

108.     For example, the following fake reviews of Allure Esthetic and Dr. Sajan were posted from IP addresses in Bangladesh and Pakistan that had no other account activity:



**Jenny Bel**
1 review

★★★★★  6 years ago

I had been auditioning as a TV meteorologist (without success) for some time and decided to redo my audition tape.  In reviewing the tape, I was struck by how large my nose looked onscreen.  Dr. Sajan did the most amazing job of streamlining my nose yet it looks totally in balance with the rest of my face.  My new nose boosted my confidence level so high and I think that new confidence is why I am now the morning meteorologist at a medium-market TV affiliate station.

 5



**Jay Franklin**
1 review

★★★★★  6 years ago

Facing breast cancer was hard but deciding to have breast reconstruction/augmentation after my treatments would have been evenmore difficult if I hadn't discussed my options with Dr. Sajan.  He and his staff members are so compassionate and caring.  I'm sure I couldn't have had finer care or better results.  My most sincere thanks to everyone.

 1

109.     Despite his longstanding practice of purchasing and paying employees to post fake positive reviews, Dr. Sajan claimed in a complaint he filed against an online reviewer in Snohomish County Superior Court that he "does not make his employees create fake accounts and write reviews."[7]

110.     Many of Defendants' fake positive reviews—including the fake Google reviews depicted above—still appear on online review sites and continue to deceptively inflate Defendants' apparent overall ratings on those consumer review platforms.

---

[7] *See Javad Sajan d/b/a Alderwood Surgical Center v. Kristin M a/k/a Jane Doe*, Snohomish Cty. Super. Ct. No. 19-2-03059-31 (Apr. 5, 2019) (Google review).

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 20

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

111.    In multiple instances, Defendants created and posted fake positive reviews after a patient posted a negative review so that the positive reviews would bury the negative one.

**G.      Defendants Used Fake Accounts to Misappropriate Rebates Earned by Patients**

112.    Galderma is a skincare company that is a subsidiary of Nestle and sells products such as Dysport (an anti-wrinkle neurotoxin similar to Botox) and Restylane. Galderma has a customer loyalty rebate program that provides rebates to *consumers* who use their products. The terms and conditions of the loyalty rebate program require patient consent for a provider to enroll the consumer into the rebate program.

113.    A former assistant to Allure Esthetic's COO and to Dr. Sajan was directed by the COO to create Galderma rewards accounts using the VPN HideMyAss! and a USB purchased by Defendants that contained hundreds of fabricated email accounts. The USB was kept locked in the COO's desk.

114.    Defendants created Galderma rewards accounts using real patient names and birthdates without patient consent. Defendants then used these accounts to log treatments that allegedly used Galderma products and seek monetary rebates from Galderma for such treatments. These payments were pocketed by the Defendants, without patient knowledge or consent.

115.    Upon information and belief, Defendants received thousands of dollars every month from the Galderma rewards program that should have gone to consumers.

**H.      Defendants Manipulated Social Media by Buying Fake "Followers" and "Likes"**

116.    In addition to fake reviews, Defendants made great efforts to manipulate social media to create a false or misleading appearance of popularity among consumers and the public at large. These efforts focused on two tactics: artificially increasing Allure's online "followers" on social media, and purchasing thousands of "likes" for Allure's social media postings.

117.    Defendants admit that their former independent contractor who passed away in 2019 "may have obtained followers for Alderwood," and that one of their former web designers "who

had access to and control over all of Alderwood's social media accounts . . . may have obtained followers on social media."

118.    According to a report prepared by CrowdTangle (an affiliate of Meta/Facebook that tracks social media engagement), on or about February 1, 2019, the number of "followers" of Defendants' Instagram account, @realdrseattle, jumped from 12,900 to 69,600. This sudden increase of 56,700 more than quadrupled Defendants' apparent number of Instagram followers.

119.    This sudden increase in Defendants' Instagram followers occurred when Dr. Sajan instructed Defendants' former web designer to purchase 60,000 followers through a vendor on BlackHatWorld (www.blackhatworld.com) using Dr. Sajan's PayPal account.

120.    As of today, Defendants' Instagram account, @realdrseattle, purports to have just over 66,000 "followers." On information and belief, most, if not the vast majority, of the over 66,000 purported "followers" of Defendants' Instagram account, @realdrseattle, are fake.

121.    Dr. Sajan's former assistant testified that Dr. Sajan talked about getting fake followers and said that the company was going to "fake it until we make it."

122.    In addition to purchasing followers on Instagram, Defendants' deceptive practices include directing employees to purchase "likes" on Instagram posts.

123.    From February 2018 until at least February 2020, Defendants used a social media bot tool called Jarvee to buy thousands of fake "likes" on Instagram, YouTube, and other social media to create the false appearance that Defendants are more popular with consumers and the public than is actually the case.

124.    Jarvee closed its business in September 2022 after Instagram began to crack down on Instagram accounts that used such services to engage in "coordinated inauthentic behavior . . . such as bot accounts."[8]

---

[8] *See* Instagram notice, *Introducing New Authenticity Measures on Instagram* (Aug. 13, 2020), *available at* https://about.instagram.com/blog/announcements/introducing-new-authenticity-measures-on-instagram/.

125.    Dr. Sajan also directed his employees to use an out-of-country company to purchase hundreds of "likes" on Instagram each time employees published an Instagram post under Dr. Sajan's account.

126.    Defendants' former web designer testified that the process of purchasing likes was as follows: "[T]here was an online tool that we would put money in through PayPal and we would say, 'If there's a new post, automatically give it a thousand likes from various fake accounts,' and we would also write fake comments that were posted on behalf of other accounts and it was an automated system that would immediately like the post after it was posted and provide specific fake comments on said posts."

127.    A second former web designer testified that at one point, he told Dr. Sajan it was "not very ethical" for Defendants to "boost" their appearance of popularity on Instagram and YouTube by buying fake "likes." Dr. Sajan's response, according to that second former web designer, was "Oh, don't worry about it, don't worry about it."

128.    When the State asked this second former web designer why Defendants used the VPN service, HideMyAss!, when buying "likes" on Instagram, he testified, "For the obvious reason, to hide what you're doing. 'Cause you don't want to get caught buying likes."

## I.    Defendants Used Deceptively Altered "Before and After" Photos for Advertising

129.    Defendants intentionally displayed altered "before and after" photos of their patients on Instagram and other social media for advertising purposes to make plastic surgery results look better than they actually were.

130.    One of Defendants' patients complained to Defendants in an August 2020 email that their "website offers a gallery of before and after photos that are photo shopped, mine specifically," adding that she had "captured a screen shot comparison of my actual office photo and the one that was posted online" and believed that Defendants' photo alterations were "morally unethical and misleading."

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 23

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

131.     One of Defendants' former employees whose responsibilities included editing photos and videos told the State that Defendants' alterations went beyond "touchups" such as "evening out of skin tones, enhancing color of photos, and removing tattoos or other identifying marks to preserve the anonymity of patients," and "would be more accurately described as photo manipulation."

132.     The former employee was directly involved in altering "before and after" photos for Defendants and reported directly to Dr. Sajan.

133.     This former employee provided specific examples of the types of alterations Defendants made: "I was asked to move a nipple several inches on the 'after' photo to make it appear symmetrical with the other. I was asked to manipulate the 'after' photograph of a patient to make it more symmetrical with the other. I was asked to manipulate the 'after' photograph of a patient who had hair plugs to cover a bald spot. And I was asked to photo shop the photos of patients who had tummy tuck procedures and make them look curvier and flatter."

134.     Dr. Sajan's former personal assistant testified that she witnessed Dr. Sajan directing Allure Esthetic's web designer to alter patient post-procedure 'after' photos to make results appear better than they were, such as hiding scarring and making body parts look more symmetrical.

135.     Defendants' former web designer confirmed that Dr. Sajan asked him to digitally alter before and after photos of plastic surgery results to deceptively make the results look better than they were.

136.     The former web designer testified that, "under the direction of Dr. Sajan," Defendants employees would "edit the afters to minimize scarring, to even out the breasts, horizontally and vertically, and just morph the photos to make the results better than they were."

137.     The former web designer further described the photo editing process in deposition testimony: "It was like BBLs or Brazilian butt lifts, I would make the butt larger. Rhinoplasty, I would make the nose better. Female to male breast surgery removal, I would reduce the scarring.

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 24

Just mainly evening things out, making them look bigger or smaller depending on the goal of the surgery, and minimizing scarring across all procedures."

138.    One former employee, a videographer, said she quit her job at Allure because she "felt it was unethical and deceptive to alter photos to that extent, especially knowing that most consumers rely on before and after photos when choosing a surgeon for cosmetic surgery."

139.    Dr. Sajan was directly involved in reviewing the altered images for the purpose of posting them online, and he would request additional modifications or alterations to them.

140.    In a deposition, a second web designer confirmed that account, while adding additional details describing the types of alterations Dr. Sajan instructed him to make in order to make the surgery results in 'after' photos appear better than they actually were: "I mean, we would, like, for . . . butt lifts, I mean, we would make the butt bigger than it was. And he [Dr. Sajan] would sometimes say, 'No, make it bigger, make it bigger.' So obviously, that wasn't the end result, I mean, the realistic result."

141.    Defendants acknowledged in the course of the State's investigation that "[e]ach 'before' and 'after' photo published to [their] websites is approved by the surgeon or provider who performed the procedure on the patient whose 'before' and 'after' photos are published."

142.    On or about September 4, 2019, one of Defendants' former web designers served Defendants with a complaint detailing, *inter alia*, Defendants' practice of instructing the former web designer to digitally alter images of surgery results.

143.    Just days later, on September 13, 2019, Defendants had at least three employees sign a document attesting that Dr. Sajan "confirmed" with them that "any pictures used on company websites, social media accounts have not been altered or the anatomy of the patients have not been changed." Dr. Sajan and Defendants' CEO and COO also signed these statements.

144.    Based on his direct role in asking employees to digitally alter images of surgery results, Dr. Sajan knew, or should have known, that this "confirmation" statement which purported

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 25

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  to confirm that Defendants did not significantly alter "before and after" photos was false when he

2  signed it.

3       145.    Archived versions of Defendants' website show that Defendants did not disclose

4  the fact that patient photos on their website were altered until sometime between late 2019 and

5  early 2020, only after Defendants received the legal complaint from their former web designer

6  detailing Defendants' practice of using altered images in their advertising.

7       146.    In or about September 2019, Defendants digitally altered their prior Instagram posts

8  by retroactively adding disclaimer language to the before and after photographs that appear on

9  Defendants' Instagram site, @realdrseattle, and acknowledged, long after the photos were

10  originally posted, that "Photographs may have been modified and edited . . . ."

## V.    CAUSES OF ACTION

### FIRST COUNT: VIOLATIONS OF CONSUMER REVIEW FAIRNESS ACT
### (15 U.S.C. § 45b)

14      147.    The State re-alleges and incorporates by reference the allegations contained in the

15  preceding paragraphs of this Complaint.

16      148.    The purpose of the CRFA is to "prohibit the use of certain clauses in form

17  contracts that restrict the ability of a consumer to communicate regarding the goods or services

18  offered    in    interstate    commerce    that    were    the    subject    of    the    contract."

19  Pub. L. 114-258, 130 Stat. 1355 (2016).

20      149.    Under the CRFA, it is "unlawful for a person to offer a form contract containing

21  a provision described as void" by the statute. 15 U.S.C. § 45b(c).

22      150.    The CRFA defines a "form contract" as "a contract with standardized terms

23  (i) used by a person in the course of selling or leasing the person's goods or services; and

24  (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate

25  the standardized terms." 15 U.S.C. § 45b(a)(3)(A)(i) & (ii).

26      151.    Under the CRFA, a provision in a "form contract" is "void from the inception" if

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

it "prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication" or "imposes a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication." 15 U.S.C. § 45b(b)(1)(A) & (B).

152.   The CRFA defines a "covered communication" as any "written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is a party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

153.   Each and every one of the form NDAs Defendants required their patients to sign was unlawful, unenforceable, and void, and constituted an independent violation of the CRFA. 15 U.S.C. § 45b(b)(1).

154.   Defendants violated the CRFA every time they offered or required a prospective patient to sign a form NDA during the intake process that restricted them from posting negative reviews.

155.   By requiring some of their patients to also sign a second form NDA provision that required them to remove any negative reviews previously posted and refrain from posting any negative reviews in the future, Defendants further violated the CRFA.

156.   The State is entitled to all appropriate relief provided and available under the CRFA, including a judgment declaring that Defendants' form NDAs violate the CRFA and were invalid and void from the inception, and an award of appropriate injunctive relief.

### SECOND COUNT: VIOLATIONS OF HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT
### (42 U.S.C. § 1320D-5, 45 C.F.R. § 164.508(b)(4))

157.   The State re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

158.   HIPAA establishes uniform national standards and legal requirements to protect sensitive patient health information from being disclosed without authorization.

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 27

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

159.    The HITECH Act authorizes the State to enforce HIPAA's privacy provisions in an appropriate district court of the United States, and to secure the remedies provided therein. 42 U.S.C. § 1320d-5(d)(1).

160.    At all times material hereto, Allure Esthetic was a "covered entity" under HIPAA because it is a health care provider that transmits health information in electronic form in connection with transactions covered by HIPAA. 45 C.F.R. § 160.103.

161.    As a covered entity, Allure Esthetic is required to comply with the HIPAA federal standards governing the privacy and security of protected health information, including the Privacy and Security Rules. *See* 45 C.F.R. § 164.302.

162.    Under HIPAA, it is unlawful for a health care provider that is a covered entity to use or disclose patient protected health information without valid authorization. 45 C.F.R. § 164.508(a)(1).

163.    A health care provider that is a covered entity also "may not condition the provision . . . of treatment . . . on provision of an authorization." 45 C.F.R. § 164.508(b)(4).

164.    This prohibition is intended to prevent covered entities from coercing patients into signing an authorization for a use or disclosure that is not necessary to carry out the primary services that the covered entity provides to the individual. 65 Fed. Reg. 82,461, 82,516 (2000).

165.    An authorization obtained as a pre-condition to treatment "is not valid." 45 C.F.R. § 164.508(b)(2).

166.    By requiring patients to sign a form NDA during the intake process that conditioned treatment upon their purported prior authorization of disclosure of private patient health information, Allure Esthetic violated HIPAA.

167.    Each and every form NDA that Allure Esthetic used with patients that conditioned treatment upon their purported prior authorization of disclosure of private patient health information, is unlawful, unenforceable, and void, and constitutes an independent violation of HIPAA.

168.     Under HIPAA, any covered entity that violates HIPAA is subject to the penalties provided under the statute. 42 U.S.C. § 1320d-5.

169.     In his capacity as the owner and operator of Allure Esthetic, Dr. Sajan directed, participated in, and/or with knowledge approved of Allure Esthetic's HIPAA violations as set forth above, and as such, he is jointly and severally liable with Allure Esthetic for these HIPAA violations.

170.     The State is entitled to all appropriate relief provided and available under HIPAA, including a judgment declaring that Defendants' practice of conditioning treatment upon a prior authorization of disclosure of private patient health information violated HIPAA, 45 C.F.R. § 164.508(b), awarding appropriate penalties, and ordering injunctive relief.

### THIRD COUNT: VIOLATIONS OF CONSUMER PROTECTION ACT (WASH. REV. CODE § 19.86.020 / UNFAIR OR DECEPTIVE ACTS OR PRACTICES / RELATING TO CRFA AND HIPAA VIOLATIONS)

171.     The State re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

172.     Pursuant to the CPA, Wash. Rev. Code § 19.86.020, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

173.     At all relevant times, Defendants engaged in "trade or commerce" as defined in the CPA, Wash. Rev. Code § 19.86.010(2).

174.     Defendants' conduct, in addition to violating the CRFA and HIPAA, is independently cognizable under the CPA.

175.     Defendants engaged in numerous unfair or deceptive acts and practices relating to the CRFA and HIPAA violations alleged above, including but not limited to:

(a)     Requiring over 10,000 patients to sign illegal NDAs during the intake process that restricted them from posting negative reviews;

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 29

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

|     | (b) | Requiring hundreds of those same patients to sign a second illegal NDA requiring them to remove any negative posted reviews and to refrain from posting negative reviews in the future; |
|-----|-----|-----|
|     | (c) | Misleading their patients into believing the illegal NDA provisions were valid and enforceable, or creating that deceptive net impression; |
|     | (d) | Using illegal NDA provisions to threaten or coerce their patients into removing negative reviews after they are posted; |
|     | (e) | Advertising the $100 consultation fee unconditionally and collecting payment from patients before disclosing that they must sign an illegal NDA before receiving services; and |
|     | (f) | Conditioning the provision of services on a prior waiver of their patients' rights to keep their PHI confidential. |

176.    These unfair or deceptive acts and practices affected the public interest in that they impacted numerous Washington consumers and other consumers. These practices constituted a pattern of conduct that Defendants committed in the course of business and are likely to continue without relief from this Court.

177.    The State is entitled to all appropriate relief under the CPA, including injunctive relief and restitution pursuant to Wash. Rev. Code § 19.86.080, civil penalties pursuant to Wash. Rev. Code § 19.86.140 of up to seven thousand five hundred dollars ($7,500) per violation, and reimbursement of the costs of this action, including reasonable attorneys' fees, pursuant to Wash. Rev. Code § 19.86.080.

## FOURTH COUNT: VIOLATIONS OF CONSUMER PROTECTION ACT (WASH. REV. CODE § 19.86.020 / UNFAIR OR DECEPTIVE ACTS OR PRACTICES / OTHER CPA VIOLATIONS)

158.    The State re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

159.     Pursuant to the CPA, Wash. Rev. Code § 19.86.020, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

160.     At all relevant times, Defendants engaged in "trade or commerce" as defined in the CPA, Wash. Rev. Code § 19.86.010(2).

161.     Defendants engaged in numerous unfair or deceptive acts and practices relating to the CRFA violations alleged above, including but not limited to:

    (a)     Creating fake positive reviews on Google and Yelp that purported to be genuine but were actually created using fake email accounts and fictional personas;

    (b)     Misappropriating cash rebates their patients earned under Galderma's customer loyalty program and concealing that from their patients;

    (c)     Buying tens of thousands of fake "followers" and thousands of fake "likes" on social media platforms to create a deceptive appearance of greater popularity to consumers or potential consumers; and

    (d)     Altering "before and after" photos of patients and using the altered photos for advertising purposes to make plastic surgery results look better than they actually were.

162.     These unfair or deceptive acts and practices affected the public interest in that they impacted numerous Washington consumers and other consumers. These practices constituted a pattern of conduct that Defendants committed in the course of business and are likely to continue without relief from this Court.

163.     The State is entitled to relief under the CPA, including injunctive relief and restitution pursuant to Wash. Rev. Code § 19.86.080, civil penalties pursuant to Wash. Rev. Code § 19.86.140 of up to seven thousand five hundred dollars ($7,500) per violation, and reimbursement of the costs of this action, including reasonable attorneys' fees, pursuant to Wash. Rev. Code § 19.86.080.

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 31

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**FIFTH COUNT: VIOLATIONS OF CONSUMER PROTECTION ACT
(WASH. REV. CODE § 19.86.020 / UNFAIR COMPETITION)**

164.    The State re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

165.    Pursuant to the CPA, Wash. Rev. Code § 19.86.020, "unfair methods of competition" in the conduct of "any trade or commerce" are unlawful.

166.    At all relevant times, Defendants engaged in "trade or commerce" as defined in the CPA, Wash. Rev. Code § 19.86.010(2).

167.    In addition to their other violations, Defendants engaged in unfair competition by distorting the marketplace to Defendants' unfair advantage, by manipulating online reviews and falsely portraying themselves on social media. This conduct includes:

(a)    Requiring over 10,000 patients to sign illegal NDAs during the intake process that restricted them from posting negative reviews;

(b)    Requiring hundreds of those same patients to sign a second illegal NDA requiring them to remove any negative reviews that were previously posted and to refrain from posting negative reviews in the future;

(c)    Misleading their patients into believing the illegal NDA provisions were valid and enforceable, or creating that deceptive net impression;

(d)    Using illegal NDA provisions to threaten or coerce their patients into removing negative reviews after they are posted;

(e)    Using illegal NDA provisions that conditioned the provision of services to patients on patients' prior waiver of their rights to keep personal health care information confidential;

(f)    Creating fake positive reviews on Google and Yelp that purported to be genuine consumer reviews but were actually created using fake email accounts and fictional personas;

1      (g)    Buying tens of thousands of fake "followers" and thousands of fake
2              "likes" on social media platforms to create a false or misleading
3              appearance of popularity; and

4      (h)    Altering "before and after" photos of patients and using the altered photos
5              for advertising purposes to make plastic surgery results look better than
6              they actually were.

7    168.    By engaging in all of these acts Defendants gained an unfair competitive
8 advantage over competing plastic and cosmetic surgery businesses that advertise, market, and
9 sell the same types of services and products that Defendants provide, but who play by the rules.

10    169.    Defendants' unfair competition affected the public interest because they distorted
11 the online marketplace for competitive advantage. These practices constituted a pattern of
12 conduct that Defendants committed in the course of business and are likely to continue without
13 relief from this Court.

14    170.    The State is entitled to relief under the CPA, including injunctive relief and
15 restitution pursuant to Wash. Rev. Code § 19.86.080, civil penalties pursuant to
16 Wash. Rev. Code § 19.86.140 of up to seven thousand five hundred dollars ($7,500) per
17 violation, and reimbursement of the costs of this action, including reasonable attorneys' fees,
18 pursuant to Wash. Rev. Code § 19.86.080.

19              **PRAYER FOR RELIEF**

20    Wherefore, the State prays for the following relief:

21    1.    That the Court adjudge and decree that Defendants have engaged in the conduct
22 complained of herein;

23    2.    That the Court declare, adjudge and decree that Defendants' conduct violates the
24 CRFA, 15 U.S.C. § 45b, by using form NDAs restricting consumers from posting negative reviews
25 of Defendants and requiring consumers to remove negative reviews previously posted;

26

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 33

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

3.      That the Court declare, adjudge and decree that Defendants' conduct violates HIPAA, 45 C.F.R. § 164.508(b)(4), by requiring patients to give prior authorization to the disclosure of private patient health information as a condition to receiving medical treatment;

4.      That the Court adjudge and decree that Defendants' acts and practices of (a) requiring patients to sign illegal NDAs during the intake process that restricted negative reviews and purported to authorize disclosure of patients' private health information; (b) requiring some patients to sign a second illegal NDA requiring them to remove negative reviews previously posted and refrain from posting negative reviews in the future; (c) misleading patients into believing illegal NDA provisions were valid and enforceable, or creating that deceptive net impression; (d) using illegal NDAs to threaten or coerce patients into removing negative reviews after they are posted; and (e) requiring patients to pay a $100 consultation fee before disclosing that they must also sign the illegal NDA in order to receive a consultation, all constitute unfair or deceptive acts or practices in trade or commerce that affect the public interest, in violation of the CPA, Wash. Rev. Code § 19.86.020;

5.      That the Court adjudge and decree that Defendants' acts and practices of (a) posting fake positive reviews that purported to be genuine consumer reviews; (b) taking cash rebates from patients that its patients earned and were entitled to receive under Galderma's customer loyalty program; (c) buying fake "followers" and fake "likes" on social media to create a false and deceptive appearance of greater popularity in the eyes of patients, the public, and consumers; and (d) altering "before and after" photos to make plastic surgery results look better than they actually were, all constitute additional unfair or deceptive acts or practices in trade or commerce that affect the public interest, in violation of the CPA, Wash. Rev. Code § 19.86.020;

6.      That the Court adjudge and decree that Defendants' conduct complained of herein constitutes unfair methods of competition in violation of the CPA, Wash. Rev. Code § 19.86.020;

7.      That the Court, pursuant to Wash. Rev. Code § 19.86.140, assess civil penalties against Defendants of up to seven thousand five hundred dollars ($7,500) per violation for each and

1    every violation of Wash. Rev. Code § 19.86.020 committed by Defendants;

2         8.    That the Court, pursuant to 42 U.S.C. § 1320d-5(d)(2), assess statutory damages of

3    up to $100 per violation, not to exceed $25,000 per calendar year, for each and every violation of

4    HIPAA, 45 C.F.R. § 164.508(b)(4);

5         9.    That the Court, pursuant to Wash. Rev. Code § 19.86.080, order restitution or

6    equitable disgorgement to consumers of all money Defendants unlawfully acquired from them

7    through Defendants' unlawful, unfair and deceptive actions described above, including

8    prejudgment interest;

9         10.   That the Court issue a preliminary and/or permanent injunction pursuant to the CPA,

10   Wash. Rev. Code § 19.86.080, the CRFA, 15 U.S.C. § 45b(e)(1), and HIPAA,

11   42 U.S.C. § 1320d-5(d)(1)(A), enjoining and restraining Defendants and their representatives,

12   successors, assigns, officers, agents, servants, employees, and all other persons acting or claiming

13   to act for, on behalf of, or in concert or participation with Defendants, from engaging in the acts and

14   practices in violation of the CPA, the CRFA, and HIPAA as specifically alleged above and any

15   similar acts and unfair business practices regarding consumers;

16        11.   That the Court adjudge and decree that the form NDAs that Defendants' patients

17   were required to sign are void and unenforceable;

18        12.   That the Court order that the Defendants, their officers, agents, employees, and

19   attorneys, and all other persons in active concert or participation with any of them, are permanently

20   enjoined from offering, attempting to enforce, or asserting the validity of, any form NDA that

21   conditions treatment upon prior authorization of disclosure of the patient's private health

22   information;

23        13.   That the Court require Defendants to notify their patients in writing, the form of

24   which shall be approved by the Court, that the prior NDAs are void and that all patients who signed

25   these illegal NDAs are free to post honest reviews of Defendants notwithstanding the restrictions

26   in those form agreements, that their purported authorization of the disclosure of protected health

COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF - 35

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  information is invalid, and that the Court further require Defendants to provide this notice on their

2  website for at least three years or such other reasonable period as determined by the Court;

3      14.    That the Court order Defendants to pay the State its costs of bringing this action,

4  including reasonable attorneys' fees, pursuant to Wash. Rev. Code § 19.86.080; and

5      15.    That the Court grant such other or additional relief as it may deem just and proper.

6      DATED this 29th day of December, 2022.

7                              ROBERT W. FERGUSON
                            Attorney General

8

9

10                              */s Matthew Geyman*
                            MATTHEW GEYMAN, WSBA #17544

11                              CAMILLE M. MCDORMAN, WSBA #53036
                            ZORBA LESLIE, WSBA #58523

12                              Assistant Attorneys General

13                              Attorneys for Plaintiff State of Washington
                            Consumer Protection Division

14                              Office of the Attorney General
                            800 Fifth Avenue, Suite 2000

15                              Seattle, WA 98104
                            matt.geyman@atg.wa.gov

16                              camille.mcdorman@atg.wa.gov
                            zorba.leslie@atg.wa.gov

17

18

19

20

21

22

23

24

25

26

# EXHIBIT A

 

## NEGATIVE REVIEWS

We take great pride in our reputation for providing the highest levels of quality medical care to our patients. However, we realize there are times when some patients will not be satisfied with the outcome of their treatments. We also recognize that in these instances, a patient has every right to voice their opinion if she/he feels we have been negligent in some way. We respect every patient's right to do so and we would welcome the opportunity to correct the issue or concern.

By signing this form I, ▮▮▮▮▮▮▮▮▮▮ date of birth ▮▮▮▮▮▮▮ understand that if I am unhappy with the care or service provided to me I will do and agree to do the following:

— I will first notify the practice by calling (206) 209-0988 or (425) 775-3561 to give Dr. Javad Sajan, Dr. Craig Jonov, their assistants or designee's, and any one person affiliated with Allure Esthetic d/b/a Gallery of Cosmetic Surgery d/b/a Alderwood Surgical Center (the practice) the opportunity to resolve the issue.

— I agree to work with the practice to correct the issue until a resolution can be made.

— I agree not leave a negative review or say anything that would hurt the reputation of the practice.

— I understand that a "negative review" is considered anything less than 4 stars and any negative comment(s).

— If I leave a negative review without contacting a representative of the practice and allowing them to resolve the issue, I give permission and allow a response from the practice with my personal health information and agree to pay a $250,000 fine.

We hope and believe you will never have to consider this, but if you do, we will continue to honor our commitment to you.

_____  _____  _____

Patient Name (Please Print)           Patient Signature                Date

_____  _____  _____

Witness Name (Please Print)           Witness Signature                Date

# EXHIBIT B

 

## NEGATIVE REVIEWS

We take great pride in our reputation for providing the highest levels of quality medical care to our patients. However, we realize there are times when some patients will not be satisfied with the outcome of their treatments. We also recognize that in these instances, a patient has every right to voice their opinion if she/he feels we have been negligent in some way. We respect every patient's right to do so and we would welcome the opportunity to correct the issue or concern.

By signing this form I, ▮▮▮▮▮▮▮▮▮▮ date of birth ▮▮▮▮▮▮▮ understand that if I am unhappy with the care or service provided to me I will do and agree to do the following:

✓ I will first notify the practice by calling (206) 209-0988 or (425) 775-3561 to give Dr. Javad Sajan, Dr. Craig Jonov, their assistants or designee's, and any one person affiliated with Allure Esthetic d/b/a Gallery of Cosmetic Surgery d/b/a Alderwood Surgical Center (the practice) the opportunity to resolve the issue.

✓ I agree to work with the practice to correct the issue until a resolution can be made.

✓ I agree not leave a negative review or say anything that would hurt the reputation of the practice without contacting the practice of my grievance.

✓ I understand that a "negative review" is considered anything less than 4 stars and any negative comment(s).

✓ If I leave a negative review without contacting a representative of the practice and allowing them to resolve the issue, I give permission and allow a response from the practice with my personal health information and agree to pay monetary damages to the practice for any losses.

We hope and believe you will never have to consider this, but if you do, we will continue to honor our commitment to you.

Patient Name (Please Print)                                        08/22/2017
                                                                   Date

Witness Name (Please Print)          Witness Signature              Date

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO RCW 19.86.110(7)          ASC004350

# EXHIBIT C

 

## Mutual Nondisclosure Agreement

We take great pride in our reputation for providing the highest levels of quality medical care to our patients. However, we realize there are times when some patients may not be satisfied with the outcome of their treatments. We also recognize that in these instances, a patient has every right to voice their opinion if they are dissatisfied with our service. We respect every patient's right to do so and we welcome the opportunity to correct any issue or concern that may arise.

If I am concerned with the care or service provided to me, Alderwood Surgical Center (DBA Gallery of Cosmetic Surgery, Allure Esthetic, and Seattle Plastic Surgery) and _____ (Patient Name) agree to do the following:

(Initials): _____

— First, Patient agrees to call Alderwood Surgical Center at (206) 209-0988 or (425) 775-3561 and allow Dr. Javad Sajan or Dr. Craig Jonov, and any other person affiliated with Alderwood Surgical Center the opportunity to resolve the issue. I understand that calling Alderwood Surgical Center is a more effective means of reaching a resolution than posting negative reviews. I understand that this Agreement covers all forms of media including online review sites.

— Alderwood Surgical Center and its affiliates will make a good faith effort to resolve your concern and will communicate with you in a timely manner to expedite the process.

— I agree to work with Alderwood Surgical Center and its affiliates to correct the issue until a resolution is reached.

If you have any questions regarding this form, please do not hesitate to ask your physician or their assistants.

_____          _____
Patient Name (Please Print)                                      Patient Signature                              Date

_____          _____
Witness Name (Please Print)                                     Witness Signature                            Date

# EXHIBIT D

## REFUND, RELEASE, SETTLEMENT AND NON-DISCLOSURE AGREEMENT

**This Release, Settlement and Non-Disclosure Agreement** (the "**Agreement**") is entered into this [Redacted] day of [Redacted – PHI/PII] 2020, by [Redacted – PHI/PII] the "**Releasing Party**") date of birth [Redacted – PHI/PII] and *Javad Sajan, M.D., Alderwood Surgical Center LLC d/b/a Allure Esthetic, and any and all entities affiliated with or owned by Javad Sajan, M.D.* (the "**Parties Released**").

This Agreement is entered into by and among the parties in complete settlement of Releasing Party's claims and/or potential lawsuit respecting, resulting from, or arising out of any and all medical care, medical advice, office visits, phone conversations, payment, treatment, injection, surgery, and/or diagnosis (the "**Confidential Matters**") to the procedure occuring on or around [Redacted – PHI/PII] 2020. Accordingly, in consideration of a refund in the amount of ***one hundred dollars*** (**$100.00**), by the Parties Released to the Releasing Party, receipt of which is acknowledged by the Releasing Party, the parties agree as follows:

1. **Release and Settlement Agreement**: Releasing Party, for themselves, their assigns, dependents, heirs, children, executors, administrators and successors, hereby releases and forever discharges any and all claims related to the Confidential Matters they may have against the Parties Released, and/or any of their present, past and future parent companies, subsidiaries, divisions, affiliates, predecessors, successors, directors, officers, attorneys, agents, representatives, vendors, suppliers, servants, insurers, employees, distributors, sales representatives, and stockholders, and all persons, for any claim, demand, action, or cause of action, suits, proceedings, judgments, liens, or third-party lawsuits at law or in equity, in contract and/or tort for any costs and expenses (including, but not limited to, attorneys fees), losses, injuries, damages, punitive damages, and charges of any nature whatsoever, whether to person or property, whether direct, consequential, or incidental, whether known or unknown, suspected or unsuspected, fixed or contingent, whether filed or prosecuted that Releasing Party now has, claims to have had, or at any time heretofore may have, including, but not limited to, all physical, mental, emotional, or psychiatric injuries or impairments, and actions for wrongful death, and any claim for loss of consortium, society, care services, comfort and/or companionship, whether developed or undeveloped, resulting or to result, known or unknown, past, present, or future, respecting, resulting from, or arising out of any and all medical care, treatment and/or diagnosis related to the Confidential Matters provided by the parties released.

2. **No Admission of Liability**: The Releasing Party agrees and acknowledges that payment by the Parties Released of the consideration specified in this Agreement is a full and complete compromise for the disputed issues between the Releasing Party and the Parties Released respecting, resulting from or arising out of any and all medical care, medical advice, office visit, treatment, injection, surgery, and/or diagnosis related to the Confidential Matters. The Releasing Party further agrees that neither the payment of sums, nor statements made in connection with the negotiations for this Agreement by the Parties Released shall be construed as admissions of liability.

Releasing Party Initial [DS Redacted – PHI/PII]

To the contrary, the Parties Released deny any such liability and it is understood that the payment of sums is the compromise of a disputed claim made in the spirit of compromise and to avoid the costs of litigation.

**3.** **Good Faith**: It is agreed by and between the Releasing Party and the Parties Released that the sums specifically set forth in the first paragraph of this document are being paid in good faith to the Releasing Party by the Released Parties in consideration of the execution of this Agreement. This Agreement shall inure to the benefit of the Parties Released and shall bind the Releasing Party, her assigns, dependents, heirs and legal representatives.

**4.** **Non-Disclosure Agreement:** The Parties therefore agree for themselves, their agents, attorneys, successors, heirs, administrators, representatives and assigns, and all related or affiliated persons, that they shall not directly or indirectly disclose, divulge, communicate, display, publish, or reveal any Confidential Matters defined herein through any medium, either orally or in writing, including, but not limited to, electronic mail, television or radio, computer networks or Internet bulletin boards, blogs, social media or other internet platforms, including but not limited to Facebook, Instagram, LinkedIn, SnapChat, Yelp, Google, and Twitter, or any other form of communication to any third party whatsoever including but not limited to statements regarding Parties Released practice, physicians, employees, procedures, and any topic or experience related to the Confidential Matters defined herein. Releasing Party further agrees to remove and delete any and all information related to Confidential Matters defined herein posted on internet platforms (including but not limited to Facebook, Instagram, LinkedIn, SnapChat, Yelp, Google, and Twitter), communicated, displayed, published or revealed prior to this Agreement. It is understood that the Releasing Party and her attorney may disclose the terms of this settlement, if necessary, to financial and tax advisors contacted by the Releasing Party and her attorneys without such contact constituting a violation of this Confidentiality Agreement. In the event that any such disclosure is necessary, any financial or tax advisor shall be informed of the confidential nature of this Agreement, and shall be directed by the Releasing Party to maintain any information provided in strict confidence.

**5.** **Breach**: A breach of any of the terms set forth in Paragraph 4 above will cause Parties Released to incur substantial economic damages and losses of types and in amounts which are impossible to compute and ascertain with certainty as a basis for recovery by Parties Released of actual damages because Parties Released cannot know in advance the impact of breach on Parties Released reputation or business, nor can it readily ascertain what costs Parties Released will incur as a result. Accordingly, if Releasing Party breaches any of the terms set forth in Paragraph 4, Released Party shall pay Parties Released $250,000 or $10,000 per day that Released Party remains in Breach, which represents a fair, reasonable and appropriate estimate of the damages. The Parties further stipulate that the agreed upon sum is not a penalty, but represents a reasonable measure of liquidated damages, based upon the parties' experience in the healthcare industry and given the nature of the losses that may result from breach.

Further, Releasing Party acknowledges that damages alone would not be an adequate remedy for the breach of any of the terms set forth in Paragraph 4.

Releasing Party Initial 

Accordingly, without prejudice to any other rights and remedies it may have, Releasing Party acknowledges and agrees that Parties Released shall be entitled to the granting of equitable relief (including without limitation injunctive relief) concerning any threatened or actual breach of any of the terms set forth in Paragraph 4 of this Agreement, without any requirement to post a bond or other security.

**6.** **Representation by the Releasing Party**:  The Releasing Party states that they have carefully read this Agreement in its entirety, they have had the opportunity to consult with counsel, and knows and understands the contents of this Agreement. The Releasing Party represents that they are not relying on the advice of the Parties Released or anyone associated with the Parties Released concerning the legal or tax consequences of this Agreement, nor is this Agreement contingent upon any favorable tax determination.

**7.** **Payment of Medical Expenses, Liens and Other Expenses**:  It is understood and agreed that portions of the sums paid pursuant to this Agreement may be used by the Releasing Party to satisfy medical expenses, liens, or other expenses for which the Releasing Party may be legally liable.  The Releasing Party agrees to defend, indemnify and hold harmless the Parties Released for injuries, damages, or expenses allegedly incurred, or to be incurred at any future time, by or on behalf of the Releasing Party respecting, resulting from, or arising out of any and all medical care, medical advice, treatment, injection, surgery, and/or diagnosis, and to indemnify the Parties Released for all costs and expenses related to defending such claims and liens, including attorney fees (such attorneys to be chosen by the Parties Released), whether or not the claims or liens or actions brought to enforce them are meritorious.

**8.** **Entire Agreement**:  This Agreement contains the entire Agreement between the Releasing Party and the Parties Released, pertaining to the matters set forth and shall be binding upon and inure to the benefit of the executors, administrators, personal representatives, heirs, successors and assigns of each.  The parties agree that this Agreement reflects the joint drafting efforts of all parties, each of whom had the right to be assisted by counsel. The parties agree that any alleged ambiguities in this Agreement shall not be construed against any party, and that this Agreement may not be amended except by a writing signed by all of the parties hereto. This Agreement constitutes the entire Agreement among the parties superseding any and all prior agreements and understandings.  In particular, but without limitation, the parties intend that this Agreement supersedes and terminates all other negotiations and agreements that might be asserted by the parties.

**9.** **Governing Law**:  The Agreement shall be construed and interpreted in accordance with the law of the State of Washington.

**10.** **Electronic Signatures**:  The execution of this Agreement by electronic mail or by any other electronic means shall be deemed to constitute effective execution of this Agreement as to the parties hereto. Such electronic signatures may be used by the parties in lieu of the original signature page(s) of this Agreement for any and all purposes. Additionally, any signatures of the parties to this Agreement that are

Releasing Party Initial

transmitted to the other party by facsimile shall be deemed original signatures for all purposes.

**11.**    **Refund Transfer Fees:** The Releasing Party acknowledges they will be soley responsible for any all fees associated with the transfer of the refund amount from the Released Parties to the Releasing Party. This includes, but is not limited to, credit card service fees, wire transfer fees, and merchant fees.

**12.**    **Release of All Claims**: The Releasing Party agrees that this Agreement shall apply to all known or unknown damages and consequences flowing there from respecting, resulting from, or arising out of any and all medical care, medical advice, treatment, injection, surgery, and/or diagnosis, that this Agreement expresses a full and complete settlement of the liability claimed and denied, regardless of the adequacy of the above considerations; and that the acceptance of this Agreement shall not operate as an admission of liability, facts, or damages on the part of anyone.

> I HAVE COMPLETELY READ THIS FINAL AGREEMENT AND FULLY UNDERSTAND AND VOLUNTARILY ACCEPT IT FOR THE PURPOSE OF FINAL RESOLUTION AND SETTLEMENT OF ANY AND ALL CLAIMS, DISPUTED OR OTHERWISE, FOR THE EXPRESS PURPOSE OF PRECLUDING FOREVER ANY OTHER CLAIMS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE INCIDENTS, INJURIES, OR DAMAGES ABOVE MENTIONED.

**Releasing Party Initial**

> I RECOGNIZE THAT THE FUTURE COURSE OF PRESENT INJURY OR OTHER DAMAGES CANNOT BE PREDICTED WITH CERTAINTY AND (1) ASSUME THE RISK THAT THE CLAIMED INJURIES OR DAMAGES MAY WORSEN IN THE FUTURE AND THAT NEW INJURIES OR DAMAGES MAY DEVELOP AND (2) ACKNOWLEDGE THAT INFORMATION REGARDING CLAIMS MADE IS SUFFICIENT TO ENTER INTO THIS FINAL AGREEMENT AND EXPRESSLY WAIVE ANY CLAIM THAT THIS RELEASE IS NOT FAIRLY AND KNOWINGLY MADE.

**Releasing Party Initial**

*[Rest of page left intentionally blank, signature page follows]*

Releasing Party Initial 

To evidence the Parties' agreement to this Agreement, they have executed and delivered it on the date set forth in the preamble.

**Releasing Party:**

Redacted – PHI/PII

DocuSigned by:

Redacted – PHI/PII
─────────────────────
*Signature*

Redacted – PHI/PII 2020
─────────────────────
Date

**Parties Released:**
*on behalf of Alderwood Surgery Center, LLC, and any and all affiliated entities*
**Gricelda Prado,**
**COO**

DocuSigned by:

─────────────────────
*Signature*

Redacted – PHI/PII 2020
─────────────────────
Date

Releasing Party Initial