1

2

The Honorable Ricardo S. Martinez

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8                        **AT SEATTLE**

9    STATE OF WASHINGTON,                    NO. 2:22-cv-01835-RSM

10                        Plaintiff,          STATE'S MOTION FOR PARTIAL
                                              SUMMARY JUDGMENT RE DEFENDANTS'
11        v.                                  LIABILITY UNDER CRFA FOR PRE-
                                              SERVICE NDAS
12   ALDERWOOD SURGICAL CENTER,
     LLC, a Washington limited liability      NOTE ON MOTION CALENDAR:
13   company; NORTHWEST NASAL                 Friday, October 6, 2023
     SINUS CENTER P.S., a Washington
14   professional service corporation; and
     JAVAD A. SAJAN, M.D.,
15
16                        Defendants.

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF THE ISSUE ............................................................................. 2

      Whether Allure's systematic use of pre-service NDAs from August 15, 2017 to
      March 24, 2022, which restricted patients from posting negative reviews and
      imposed penalties for doing so, violated the CRFA, 15 U.S.C. § 45b, based on
      undisputed facts and as a matter of law. ..................................................................... 2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 2

      A.   For Almost Five Years, Allure Required Patients to Sign Pre-Service NDAs
           that Restricted them from Posting Negative Online Reviews ................................... 2

           1.   Allure's First Pre-Service NDA Prohibited Negative Reviews and
                Required Patients to Agree to Waive HIPAA Protections and Pay a
                $250,000 Fine for Violating the Agreement ....................................... 5

           2.   Allure's Second Pre-Service NDA Restricted Negative Reviews and
                Required Patients to Agree to Waive HIPAA Protections and Pay
                Monetary Damages for Any Losses to the Business Resulting from a
                Negative Review ................................................................................ 5

           3.   Allure's Third Pre-Service NDA Continued to Restrict Negative Reviews ...... 6

      B.   Congress Unanimously Passed the CRFA to Protect Consumers Right to
           Share and Receive Truthful Information about Businesses ...................................... 7

      C.   Plaintiff Timely Notified the Federal Trade Commission of this Suit .................... 9

      D.   This Court Has Previously Addressed Allure's Third Pre-Service NDA ................ 9

IV.   ARGUMENT ........................................................................................................ 9

      A.   Legal Standards .................................................................................................. 9

      B.   Allure's Pre-Service NDAs Violated the CRFA .................................................... 11

           1.   For Purposes of the State's CRFA Claim, Allure's Pre-Service NDAs
                Should Be Viewed Through the Lens of an Ordinary Consumer ................... 11

           2.   Allure's Pre-Service NDAs Are Form Contracts under the CRFA ................ 12

           3.   Under the CRFA, Allure's Pre-Service NDAs "Prohibit" and/or
                "Restrict" Consumer Reviews and Impose Penalties if Patients Do Not
                Comply ............................................................................................. 13

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - ii
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

a.   Allure's first pre-service NDA prohibits patients from posting negative reviews and imposes a $250,000 penalty on patients who post a negative review in violation of the agreement ............................... 16

b.   Allure's second pre-service NDA restricts patients from posting negative reviews and imposes monetary damages on patients who post a negative review in violation of the agreement ............................... 17

c.   Allure's third pre-service NDA restricts patients from posting negative reviews ....................................................................... 19

V.   CONCLUSION ............................................................................................... 20

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - iii
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................. 10

*Boise Cascade Corp. v. EPA*,
  942 F.2d 1427 (9th Cir. 1991) ............................................................................ 14, 15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................. 10

*Children's Hosp. & Health Ctr. v. Belshe*,
  188 F.3d 1090 (9th Cir. 1999) .................................................................................. 14

*Edmondson v. Allen-Russell Ford, Inc.*,
  577 F.2d 291 (5th Cir. 1978) .................................................................................... 11

*FTC v. AT&T Mobility LLC*,
  883 F.3d 848 (9th Cir. 2018)..................................................................................... 14

*FTC v. Roca Labs, Inc.*,
  345 F. Supp. 3d 1375 (M.D. Fla. 2018)...................................................................... 7

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009) .................................................................................... 10

*FTC v. Sterling Drug, Inc.*,
  317 F.2d 669 (2d Cir. 1963) ..................................................................................... 12

*Ma v. Ashcroft*,
  361 F.3d 553 (9th Cir. 2004) .................................................................................... 18

*Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*,
  18 F.3d 1468 (9th Cir. 1994) .................................................................................... 10

*People of New York v. Network Associates, Inc.*,
  758 N.Y.S.2d 466 (N.Y. Supr. Ct. 2003)..................................................................... 7

*Scarborough v. Atl. Coast Line R. Co.*,
  178 F.2d 253 (4th Cir. 1949) .................................................................................... 18

*Smith v. Cash Store Mgmt., Inc.*,
  195 F.3d 325 (7th Cir. 1999) .................................................................................... 11

*Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*,
  No. 3:23-CV-00046-DCLC-JEM, 2023 WL 2299570 (E.D. Tenn. Feb. 28, 2023)........ 10, 16

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - iv
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Topa Equities, Ltd. v. City of Los Angeles*,
   342 F.3d 1065 (9th Cir. 2003) ........................................................ 15

*United States v. Mohrbacher*,
   182 F.3d 1041 (9th Cir. 1999) ........................................................ 15

*United States v. Williams*,
   659 F.3d 1223 (9th Cir. 2011) ................................................... 14, 18

**Statutes**

15 U.S.C. § 45b(a)................................................................................. 8

15 U.S.C. § 45b(a)(2)...........................................................................14

15 U.S.C. § 45b(a)(3)...........................................................................12

15 U.S.C. § 45b(a)(3)(A) ..................................................................... 11

15 U.S.C. § 45b(b).........................................................................8, 15

15 U.S.C. § 45b(b)(1)................................................................... passim

15 U.S.C. § 45b(b)(1)(A)................................................................13, 18

15 U.S.C. § 45b(b)(1)(B)......................................................................13

15 U.S.C. § 45b(c)................................................................8, 10, 14, 20

15 U.S.C. § 45b(d)(2)(A).......................................................................8

15 U.S.C. § 45b(e)(1).........................................................................8, 9

15 U.S.C. § 45b(e)(2)(A)........................................................................9

**Rules**

Fed. R. Civ. P. 56(a)................................................................... 10

**Other Authorities**

162 Cong. Rec. (2016)...............................................................  7, 11, 14

Ethan Fung et al., *What Do Patients Look for When Scheduling Their Initial Elective Aesthetic Plastic Surgery Consultation?*, Aesthetic Plastic Surgery (Aug. 24, 2023)......................8

*Negotiate*, Black's Law Dictionary (11th ed. 2019)...................................12

The Oxford English Dictionary,
   https://www.oed.com/view/Entry/164018?rskey=o5HRYv&result=2#eid...........................15

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - v
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Unabridged Merriam-Webster.com,
    https://unabridged.merriam-webster.com/unabridged/impede................................................16

Unabridged Merriam-Webster.com,
    https://unabridged.merriam-webster.com/unabridged/penalty................................................15

Unabridged Merriam-Webster.com,
    https://unabridged.merriam-webster.com/unabridged/prohibit................................................15

Unabridged Merriam-Webster.com,
    https://unabridged.merriam-webster.com/unabridged/restrict................................................15

Y. Alicia Hong et al., *What Do Patients Say About Doctors Online: a Systematic Review of Studies of Patient Online Reviews*, Journal of Medical Internet Research 21(4) (April 8, 2019)………………………………………………………………..8

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - vi
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.     INTRODUCTION

Defendants Alderwood Surgical Center, LLC, Northwest Nasal Sinus Center P.S., and their owner, Dr. Javad Sajan, (collectively, Allure) used effective—albeit illegal—methods to ensure they got great online reviews. For almost five years, the stack of intake forms Allure gave new patients included a form non-disclosure agreement (NDA) that purported to restrict patients from posting negative reviews online. Allure required patients to sign the NDA before providing any service or treatment, or even a consultation. Every version of Allure's pre-service NDA restricted, and in some cases prohibited outright, patients from posting honest negative reviews about Allure's plastic and cosmetic surgery business. Two versions required patients to agree to a monetary penalty if they posted negative reviews in violation of the agreement. These pre-service NDAs, on their face, are specifically and unambiguously barred by the Consumer Review Fairness Act (CRFA), 15 U.S.C. § 45b, which Congress unanimously enacted in December 2016 to curb the abusive practices at issue in this case. The CRFA's application to Allure's pre-service NDAs is a pure question of law that this Court can and should resolve on summary judgment.

Undisputedly, from August 15, 2017 to March 24, 2022, Allure used three iterations of its pre-service NDA to restrict negative reviews. Allure included these pre-service NDAs in its intake forms for new patients; the form contracts and their standard terms were not individually negotiated and did not vary from patient to patient. The pre-service NDAs all prohibited or restricted patients from posting honest negative reviews. Two of the three versions went farther, requiring patients to agree that if they posted a negative review in violation of the NDA, they would be subject to monetary penalties or damages. Two of the three also required patients to agree that if they violated the NDA, Allure could use their HIPAA-protected information when responding to the patient's negative review.

Congress enacted the CRFA to hold businesses accountable for manipulating their online reputation in a way that silences existing consumers and deceives future consumers. The CRFA prohibits take-it-or-leave-it form contracts between businesses and consumers that restrict

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 1
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

consumers from posting honest online reviews, such as the ones here. Preventing consumers from

making informed decisions when choosing a healthcare provider, in some cases for life-changing

treatments, is especially harmful. The form NDAs Allure required patients to sign violate the CRFA

and are void. Pursuant to Fed. R. Civ. P. 56(a), the State respectfully asks the Court to determine

that Allure's pre-service NDAs from August 15, 2017 to March 24, 2022 violated the CRFA.[1]

## II.   STATEMENT OF THE ISSUE

Whether Allure's systematic use of pre-service NDAs from August 15, 2017 to

March 24, 2022, which restricted patients from posting negative reviews and imposed penalties for

doing so, violated the CRFA, 15 U.S.C. § 45b, based on undisputed facts and as a matter of law.

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   For Almost Five Years, Allure Required Patients to Sign Pre-Service NDAs that Restricted them from Posting Negative Online Reviews

From August 15, 2017 to March 24, 2022, Allure required its patients to sign a pre-service

NDA. During this period, Allure used three different iterations of the pre-service NDA. *See*

Declaration of Camille McDorman (McDorman Decl.), Ex. A (9/14/22 Supplemental and

Amended Response to State's Civil Investigative Demand, Interrogatory No. 1) (identifying the

three pre-service NDA forms and admitting that Allure used them from 8/15/17-8/21/17, 8/22/17-

1/11/19, and 1/12/19-3/24/22, respectively).

As Allure's Patient Care Coordinator from 2019 to 2021—years during which Allure

used the third version of the pre-service NDA—explained, "[a]s a part of the check-in process

every patient was given a stack of intake forms, including a form that talked about not posting

negative reviews." Declaration of Shailyn Berry, Dkt. #32-15 at p. 3, ¶ 4 (Berry Decl.).[2] She

---

[1] This motion is limited to the issue of Defendants' liability under the CRFA with respect to these *pre-service* NDAs. The State reserves its CPA and HIPAA claims and the issue of penalties and other relief for Allure's pre-service NDA violations, as well as the question of whether Allure's use of its different, *post-service* form NDA to prohibit patients from posting negative reviews *after* receiving services violated the CRFA, for later determination by the Court.

[2] For ease of reference, citations to page numbers of documents already in the court record are cited according to the ECF page number.

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 2
(2:22-cv-01835-RSM)

recalls that "Allure required every patient to sign all the forms in the stack, including the form about not posting negative reviews," and "[w]e were instructed to tell them if they didn't complete and sign all the forms they were not allowed to see the doctor." *Id.*, ¶ 5. A registered nurse who worked for Allure from May 2016 through May 2018, when Allure used the first two versions of the pre-service NDA, confirmed the same was true during that earlier period. McDorman Decl., Ex. B (Declaration of Sade Barrington (Dec. 15, 2021) at p.2, ¶¶ 2, 4 (Barrington Decl.) ("My responsibilities included greeting new patients and reviewing and securing pre-op paperwork, including a non-disclosure agreement. . . . Dr. Sajan refused to see potential patients who had not signed the non-disclosure agreement.")).

The language of all three versions of the pre-service NDA expressly prohibited or restricted patients from posting negative reviews. McDorman Decl., Ex. C (first pre-service NDA, used from 8/15/17-8/21/17, prohibiting patients from posting any "negative review" and defining "negative review" as "anything less than 4 stars and any negative comments"); Ex. D (second pre-service NDA, used from 8/22/17-1/11/19, requiring patients to agree "not [to] leave a negative review . . . without contacting the practice of my grievance," again defining "negative review" as "anything less than 4 stars and any negative comment(s)"); Ex. E (third pre-service NDA, used from 1/12/19-3/24/22, requiring patients if they have any concerns with Allure's care or service, "First . . . to call [Allure] . . . and allow [Allure] the opportunity to resolve the issue" and "to work with [Allure] . . . to correct the issue until a resolution is reached").

In addition to restricting reviews, the first two versions of the pre-service NDA also required patients to agree to pay a monetary penalty if they did post a negative review—initially it required patients to agree to pay a $250,000 fine, and then in the next version, it required them to agree to pay monetary damages for any losses to the business caused by a negative review. *Id.*, Ex. C (requiring patients to "agree to pay a $250,000 fine"), Ex. D (requiring patients to "agree to pay monetary damages to the practice for any losses"). The first two versions of the pre-service NDA further required patients to agree that if they violated the NDA, the patient gave Allure

1    "permission and allow a response from the practice with my personal health information." *Id.*

2    When a patient's first appointment was a consultation with Dr. Sajan, Allure presented

3    them with the pre-service NDA only after the patient had paid a consultation fee. Berry Decl.,

4    Dkt. #32-15 at p. 3 ¶ 6; McDorman Decl., Ex. B, Barrington Decl., pp. 2-3 ¶¶ 4-6; Declaration of

5    Cynthia Tamlyn, Dkt. #32-2 at pp. 3, 5-9, ¶¶ 2-3, Ex. A, B (Tamlyn Decl.); Declaration of

6    Victoria Hester, Dkt. #34-2 at pp. 3-4, 10-13, ¶¶ 3-7, Ex. B (Hester Decl.); Declaration of David

7    Lundin, Dkt. #33-1 at pp. 3, 9-12 ¶¶ 6-8, Ex. B.

8    "At times, patients did not want to sign the form and were refused treatment and would

9    get upset that they had spent time and money [on the consultation fee]." Berry Decl.,

10   Dkt. #32-15 at p. 3, ¶ 6. One patient described her alarm when first reading the pre-service NDA

11   after paying the fee: "I did not understand the need for it, nor did I want to sign the form, but I

12   had already paid the $100 consultation fee and was told that the fee was non-refundable." Hester

13   Decl., Dkt. #34-2 at p. 4, ¶ 7. Another consumer who made an appointment for her minor child

14   was required to pay the $100 consultation fee to schedule the appointment, and then, when she

15   and her son arrived for the consultation, was required to complete the intake documents,

16   including the pre-service NDA. Tamlyn Decl., Dkt. #32-2 at p. 3 ¶¶ 2-3. She was concerned

17   about how restrictive the agreement was, especially before they had even seen the doctor, and

18   ultimately her son decided not to proceed with the consultation. *Id.*, ¶¶ 3-4. At least one patient

19   had no idea that she had signed the pre-service NDA as a part of the intake forms. Declaration

20   of Mina Hogan, Dkt. #34-4 at p. 3, ¶ 3. A different patient assumed that the NDA, though

21   perceived as "unusual" and uncommon in a medical practice, was likely innocuous because

22   Allure appeared to have such stellar consumer reviews online. McDorman Decl., Ex. G

23   (Declaration of Nicole Murphy (June 28, 2023) at p. 3, ¶ 5).

24   Regardless of the patients' reactions to the NDA, it was a take-it-or-leave-it form

25   contract, with standardized terms that were not negotiated and did not vary from patient to

26   patient. This is evident from the form language of the pre-service NDAs themselves. McDorman

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 4
(2:22-cv-01835-RSM)

Decl., Exs. C-F (first, second, and third pre-service NDAs); *see also id.*, Ex. A (Allure's admission that it used these NDAs from 8/15/17-8/21/17, 8/22/17-1/11/19, and 1/12/19-3/24/22).

**1.    Allure's First Pre-Service NDA Prohibited Negative Reviews and Required Patients to Agree to Waive HIPAA Protections and Pay a $250,000 Fine for Violating the Agreement**

Allure's first pre-service NDA prohibited negative reviews outright and required patients to agree to waive HIPAA protections for their personal health information and pay a $250,000 fine for violating the agreement. The NDA, entitled "**NEGATIVE REVIEWS**," required patients to agree that if they were unhappy with Allure's care or services they agreed to do the following:

(1) "*first* notify the practice" to give it "the opportunity to resolve the issue;"

(2) "agree to work with the practice to correct the issue *until* a resolution can be made;"

(3) "agree to not leave a negative review or say anything that would hurt the reputation of the practice;"

(4) "understand that a 'negative review' is considered anything less than 4 stars and any negative comment(s);" and

(5) if the patient "leave[s] a negative review without contacting a representative of the practice and allowing them to resolve the issue," then the patients agrees "to pay a $250,000 fine" and gives permission and allows a response from the practice with the patient's personal health information.

McDorman Decl., Ex. C (emphasis added). While this version of Allure's form NDA was used for a short time, from August 15, 2017 to August 21, 2017, it provided the foundation for Allure's future iterations of the pre-service NDA.

**2.    Allure's Second Pre-Service NDA Restricted Negative Reviews and Required Patients to Agree to Waive HIPAA Protections and Pay Monetary Damages for Any Losses to the Business Resulting from a Negative Review**

The second iteration of Allure's pre-service NDA, entitled "**NEGATIVE REVIEWS**," "**Online Reputation Intake Forms (5)**," and "**Online Reputation**," was used from

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 5
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    August 22, 2017 to January 11, 2019. McDorman Decl., Exs. A, D, F. This version was

2    substantially similar to the first iteration, with two notable differences. First, rather than outright

3    prohibiting all negative reviews, it conditioned a patient's freedom to leave a negative review on

4    the patient's agreement to contact the practice about any "issue" or "grievance" before posting.

5    McDorman Decl., Exs. D, F.[3] "[C]ontacting the practice," however, encompassed the same onerous

6    and potentially limitless preconditions found in the first pre-service NDA: patients who were

7    unhappy with Allure's services or care were required to agree to "*first*" call the practice and "allow

8    [Allure] the opportunity to resolve the issue," and "work with" Allure "*until* a resolution can be

9    made." *Id.* (emphasis added).

10       Second, Allure modified the monetary penalty provision. In the second version of the

11   pre-service NDA, rather than imposing a flat $250,000 fine if patients violated the NDA, Allure

12   required them to "give permission and allow a response from the practice with my personal

13   health information and agree to pay monetary damages to the practice for any losses" if the

14   patient left a negative review before contacting Allure and "allow[ing] them to resolve the

15   issue." *Id.*

16       **3.    Allure's Third Pre-Service NDA Continued to Restrict Negative Reviews**

17       The third iteration of Allure's pre-service NDA, used from January 11, 2019 to

18   March 24, 2022, contained similar preconditions to those in the prior versions and restricted

19   patients from posting negative reviews. McDorman Decl., Ex. E. This agreement, entitled

20   "**Mutual Nondisclosure Agreement**," required patients to agree that if they have any concerns

21

22       [3] The second version of the NDA had several subtypes with minor differences in wording. *See*
23   McDorman Decl., Ex. F (subtypes of second pre-service NDA showing minor variations). The
     differences included a different title on some (with some titled "Negative Reviews" and others titled
24   "Online Reputation" and "Online Reputation Intake Forms (5)") and, in a later subtype, the addition of
     the wording "Due to HIPAA law, I understand and agree to the following" preceding the language in
25   which the patient agreed that Allure could use their personal health information if they left a negative
     review in violation of the NDA. *Id.* Because these minor differences do not alter the basic wording that
26   distinguishes the second pre-service NDA from the other two versions, for the sake of simplicity these
     subtypes are referred to collectively as the "second pre-service NDA."

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 6
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

about the care or services they received, "*first*" they would call the practice and "allow [Allure] the opportunity to resolve the issue," and then, after contacting Allure to discuss their concerns, they would "work with" Allure "*until* a resolution is reached." *Id.* (emphasis added). This precondition to work with Allure until a resolution is reached was materially consistent throughout all three versions. *Id.*, Exs. D-F.

**B.    Congress Unanimously Passed the CRFA to Protect Consumers Right to Share and Receive Truthful Information about Businesses**

Manipulating online reviews has long been recognized as an unfair and deceptive business practice under state consumer protection law and the Federal Trade Commission Act (FTC Act). *See, e.g.*, *FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1393-96 (M.D. Fla. 2018) (based on pre-CRFA conduct, holding that business's threats to enforce gag clauses in form agreements to restrict consumers from posting negative reviews were "unfair" under the FTC Act); *People of New York v. Network Associates, Inc.*, 758 N.Y.S.2d 466, 469-71 (N.Y. Supr. Ct. 2003) (holding that a form provision that restricted consumers from publishing reviews of defendant's products was deceptive and unenforceable under New York consumer protection law).

In 2016, Congress responded to the proliferation of businesses using gag clauses and non-disparagement clauses in form contracts by unanimously passing the CRFA, recognizing the importance of ensuring that consumers can freely communicate regarding a seller's goods, services, and conduct. 162 Cong. Rec. 12338 (2016) (Statement of Rep. Schakowsky). As one Congressperson aptly noted, "[c]onsumers should be able to voice their criticisms, and allowing reviews can help other consumers make informed choices." *Id.* Similarly, another observed: "This system only works if consumers have access to all information available . . . including both positive and negative reviews. We simply cannot allow companies to bully or attempt to silence customers who want to offer negative but honest assessments of products or services." 162 Cong. Rec. 12339 (2016) (Statement of Rep. Swalwell).

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 7
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    This is particularly important in the healthcare context, where the patient's relationship

2    with their health care provider necessarily depends on access to truthful information and on

3    patient-physician trust. Online reviews are often a consumer's primary—if not only—source of

4    third-party information about health care providers in their search for a provider they feel they

5    can entrust with sensitive, and in some cases life-altering, procedures. Y. Alicia Hong et al.,

6    *What Do Patients Say About Doctors Online: a Systematic Review of Studies of Patient Online*

7    *Reviews*, Journal of Medical Internet Research 21(4) (April 8, 2019) (discussing increasing

8    importance of online reviews in patients' decision making), *available at*

9    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6475821/ (last visited Sept. 12, 2023); *see also*

10   Ethan Fung et al., *What Do Patients Look for When Scheduling Their Initial Elective Aesthetic*

11   *Plastic Surgery Consultation?*, Aesthetic Plastic Surgery (Aug. 24, 2023) (survey of 593 patients

12   who had plastic surgery consultations or were planning to have one in the future, finding that

13   "patients considered surgeon's online reviews, presence at follow-up visits, and the availability

14   of pricing information the most important when booking a plastic surgery consultation"),

15   *available at* https://pubmed.ncbi.nlm.nih.gov/37620567/ (last visited Sept. 12, 2023).

16   The CRFA provides that a form contract provision that "prohibits or restricts the ability"

17   of a consumer to communicate a review or assessment of a business's goods, services, or conduct

18   is "void from inception." 15 U.S.C. § 45b(a)-(b). Offering a form contract with such a provision

19   is unlawful under the Act. 15 U.S.C. § 45b(c). The statute empowers the FTC to enforce this

20   section in the same manner as it would any other unfair or deceptive act or practice provision

21   under the FTC Act. 15 U.S.C. § 45b(d)(2)(A). And it grants state attorneys general the authority

22   to bring enforcement actions on behalf of their residents to obtain "appropriate relief."

23   15 U.S.C. § 45b(e)(1).

24   Online review sites have also embraced the CRFA and integrated it into their own

25   policies. Yelp, for example, expressly requires companies that list themselves on Yelp, such as

26   Allure, to comply with the CRFA, and prohibits them from using "gag clauses" that restrict

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 8
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    consumers from posting negative reviews. McDorman Decl., Ex. H (Yelp's Terms of Service).

2    Another example is RealSelf, an online review site that features reviews of healthcare providers,

3    whose General Counsel confronted Allure's in-house legal counsel about whether Allure was

4    using "some sort of 'no negative reviews' or non-disclosure agreement with its patients,"

5    expressly referring to the "Consumer Review Fairness Act." McDorman Decl., Ex. I (email from

6    Josh King, General Counsel of RealSelf, to Andrew Olmsted, Allure's in-house counsel).

7    **C.      Plaintiff Timely Notified the Federal Trade Commission of this Suit**

8            The State brings this action pursuant to authority granted to attorneys general in the

9    CRFA. 15 U.S.C. § 45b(e)(1); Dkt. #1 at p. 5, ¶ 22. Before initiating this case, the State notified

10   the FTC that it intended to bring a civil action under that authority, as the statute requires. *See*

11   15 U.S.C. § 45b(e)(2)(A); McDorman Decl., Ex. J (12/28/22 letter to Anisha Dasgupta, FTC's

12   General Counsel, notifying the FTC of the State's intent to bring this action and attaching

13   complaint).

14   **D.      This Court Has Previously Addressed Allure's Third Pre-Service NDA**

15           Allure brought an unsuccessful Motion for Partial Judgment on the Pleadings as to the

16   third version of Allure's pre-service NDA. It argued that "[n]othing in the language of [the Third

17   NDA] can be fairly interpreted to prohibit or restrict protected activity under the CRFA." Dkt.

18   #17 at p. 8. This Court rejected that argument, finding that the third pre-service NDA's

19   requirement that patients work with Allure until a resolution is reached "edges closer to an actual

20   prohibition on negative reviews," and concluding that "the Agreement could easily be construed

21   by a fact-finder as prohibiting or restricting the ability of a consumer to communicate a negative

22   review of Defendants' business." Dkt. #22.

23                               **IV.     ARGUMENT**

24   **A.      Legal Standards**

25           The purpose of summary judgment is to avoid unnecessary trials or, as here, trials of

26   unnecessary issues when there is no dispute as to the material facts and a party is entitled to

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 9
(2:22-cv-01835-RSM)

judgment as a matter of law. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994); Fed. R. Civ. P. 56(a). Parties may move for partial summary judgment as to a claim or part of a claim. Fed. R. Civ. P. 56(a); *see also* Advisory Committee Note to 2010 amendment, Subdivision (a). Partial summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

The CRFA provides that a provision of a form contract is "void from the inception" if the provision either "prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication" or "imposes a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication." 15 U.S.C. § 45b(b)(1). In addition to voiding these contracts, the CRFA further provides that it is unlawful to offer a form contract containing one of those void provisions. 15 U.S.C. § 45b(c); *see also Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, No. 3:23-CV-00046-DCLC-JEM, 2023 WL 2299570, at *5 (E.D. Tenn. Feb. 28, 2023) (entering preliminary injunction prohibiting sales agreements preventing consumer reviews, pursuant to Tennessee Attorney General's CRFA claim).

Here, there are no disputed material facts as to the language of Allure's pre-service NDAs used from August 15, 2017 to March 24, 2022, or the manner in which it offered them. Therefore,

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 10
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

as a matter of law, the Court should hold that Allure violated the CRFA by offering these pre-service NDAs to restrict its patients from posting negative reviews.

**B.    Allure's Pre-Service NDAs Violated the CRFA**

    **1.    For Purposes of the State's CRFA Claim, Allure's Pre-Service NDAs Should Be Viewed Through the Lens of an Ordinary Consumer**

The provisions at issue in a CRFA claim should be viewed through the lens of an ordinary consumer, not a legal scholar. The form contracts covered by the CRFA are only those "with standardized terms" that are "imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3)(A). Congress noted that some businesses have "snuck so-called non-disparagement clauses in terms of service agreements" and that consumers "often don't realize they have just given up their right to speak openly about a bad experience." 162 Cong. Rec. 12338 (2016) (Statement of Rep. Schakowsky). Here, patients were presented with the pre-service NDA with a slew of other forms they had to sign, sometimes only receiving the paperwork after arriving at Allure's office for their appointment and after they had paid a consultation fee of $100 or more.

A contract that is formed from such an uneven power dynamic, in a take-it-or-leave-it form contract, should be evaluated from the vantage point of the audience for which it was intended: an ordinary consumer. The same principle governs written communications to consumers regulated under other federal consumer protection laws as well, including credit disclosures mandated under the Truth and Lending Act (TILA), and advertisements regulated under other provisions of the FTC Act. *See Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325, 327-28 (7th Cir. 1999) ("The sufficiency of TILA-mandated disclosures is to be viewed from the standpoint of an ordinary consumer, not the perspective of a Federal Reserve Board member, federal judge, or English professor.") (internal citation omitted); *Edmondson v. Allen-Russell Ford, Inc.*, 577 F.2d 291, 296 (5th Cir. 1978) (viewing a disclosure of credit terms by the audience for which it was intended, namely, "ordinary laypersons"); *FTC v. Sterling*

1    *Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) (holding that advertisements should be viewed from

2    the perspective of the general public).

3         **2.**      **Allure's Pre-Service NDAs Are Form Contracts under the CRFA**

4        Allure's pre-service NDAs are form contracts under the CRFA because: (1) the contracts

5    had standardized terms; (2) Allure used them in the course of selling their medical practice's

6    services and goods; and (3) the contracts were imposed without providing patients a meaningful

7    opportunity to negotiate the standardized terms.

8        The CRFA defines a "form contract" as "a contract with standardized terms" that is "used

9    by a person in the course of selling or leasing the person's goods or services"; and "imposed on

10    an individual without a meaningful opportunity for such individual to negotiate the standardized

11    terms." 15 U.S.C. § 45b(a)(3). "Negotiate" is an interactive process defined as "to communicate

12    with another party for the purpose of reaching an understanding," and "to bring about by

13    discussion or bargaining." *Negotiate*, Black's Law Dictionary (11th ed. 2019).

14        First, while Allure's pre-service NDAs had several successive iterations, each version

15    had standardized terms that did not vary from patient-to-patient. McDorman Decl., Ex. C-F.

16    Patients were only presented with a different set of standardized terms when Allure modified the

17    form NDA to create a new iteration (i.e., changing from the first to the second version, and then

18    from the second to the third) which it then applied to future patients. *Id.*; *see supra* Section III(A).

19        Second, it is undisputable that Allure's pre-service NDAs were used by Allure in the

20    course of selling its services to patients. Allure offered the pre-service NDAs to patients who

21    were themselves in the process of purchasing medical services from Allure. *See supra* Section

22    III(A). But Allure's use of the NDAs went well beyond those individual transactions, because it

23    also used them to manipulate and inflate its patient reviews to market its services to the public

24    and potential future patients for future sales of its services.

25        Third, Allure presented the pre-service NDAs to patients along with several other forms

26    that patients were required to sign as new patients. *Id.* For patients whose first appointment was

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 12
(2:22-cv-01835-RSM)

a consultation, Allure sent them the pre-service NDA only after they paid the consultation fee. *Id.* In some instances, patients were presented with the pre-service NDA only once they arrived to the office the day of their appointment. Tamlyn Decl., Dkt. #32-2 at p. 3 ¶¶ 2-3. Other patients were sent the form electronically before their appointment. Hester Decl., Dkt. #34-2 at p. 3, ¶¶ 3-5. In either circumstance, the pre-service NDA was not presented as a proposed agreement for patients to review and negotiate. It was just one of multiple standard forms that new patients were sent and required to complete before receiving services from Allure. From employee and consumer testimony it is evident that patients had no meaningful opportunity to negotiate the terms.

There is no genuine issue of material fact that Allure's pre-service NDAs: (1) were offered with standardized terms that did not vary from patient to patient and were only modified when Allure used a revised iteration that applied to future patients; (2) were used by Allure in the course of selling its services; and (3) were offered to consumers as a part of their initial new-patient forms. Thus, the pre-service NDAs are "form contracts" under the CRFA as a matter of law.

### 3. Under the CRFA, Allure's Pre-Service NDAs "Prohibit" and/or "Restrict" Consumer Reviews and Impose Penalties if Patients Do Not Comply

Having established that the pre-service NDAs are form contracts, and the contract language being undisputed, the Court may find as a matter of law that Allure violated the CRFA through a facial assessment of the pre-service NDAs themselves. Allure's pre-service NDAs violated the CRFA in two ways. First, each version "prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication." 15 U.S.C. § 45b(b)(1)(A). Second, the first and second pre-service NDAs both "impose[ ] a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication." 15 U.S.C. § 45b(b)(1)(B).

1    The CRFA provides that a form contract provision that either "prohibits or restricts the

2    ability of an individual who is a party to the form contract to engage in a covered

3    communication" or "imposes a penalty or fee against an individual who is a party to the form

4    contract for engaging in a covered communication" are void and that it is unlawful to offer such

5    a contract. 15 U.S.C. §§ 45b(b)(1), 45b(c). "[C]overed communication" is defined by the CRFA

6    as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of,

7    including by electronic means, the goods, services, or conduct of a person by an individual who

8    is party to a form contract with respect to which such person is also a party."

9    15 U.S.C. § 45b(a)(2).

10    Basic principles of statutory construction guide interpretation of the undefined terms. "In

11    statutory construction, our starting point is the plain language of the statute." *United States v.*

12    *Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011). "To determine the plain meaning of a statutory

13    provision, we examine not only the specific provision at issue, but also the structure of the statute

14    as a whole, including its object and policy." *Children's Hosp. & Health Ctr. v. Belshe*,

15    188 F.3d 1090, 1096 (9th Cir. 1999). The CRFA must be interpreted "as a whole, giving effect

16    to each word and making every effort not to interpret a provision in a manner that renders other

17    provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp.*

18    *v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991).

19    The CRFA is also a remedial statute intended to protect consumers. Congress's stated

20    purpose in passing the law was to stop businesses from using form contracts "[i]n an unjust effort

21    to stop consumers from posting honest reviews online" by "mak[ing] these clauses illegal and

22    void[ing]    any    contract    that    contains    a    non-disparagement    clause."

23    162 Cong. Rec. 12338-9 (2016) (Statement of Rep. Kennedy). Because the CRFA is a remedial

24    statute, it "should be construed broadly to effectuate its purposes.'" *FTC v. AT&T Mobility LLC*,

25    883 F.3d 848, 854 (9th Cir. 2018) (citation omitted).

26

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 14
(2:22-cv-01835-RSM)

1    Because the CRFA applies to a form contract that "prohibits or restricts," the term

2    "restrict" must have a separate meaning from "prohibit," since otherwise Congress's inclusion

3    of the term would be superfluous. *See Boise Cascade*, 942 F.2d at 1432 (statute is interpreted to

4    avoid rendering term superfluous). Because the CRFA does not define "prohibit" or "restrict,"

5    the terms should be given their "ordinary meaning" by looking to dictionary definitions. *United*

6    *States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) ("When there is no indication that

7    Congress intended a specific legal meaning for the term, the court may look to sources such as

8    dictionaries for a definition.").

9    Merriam-Webster defines "prohibit" as "to forbid by authority or command; to prevent

10   from doing or accomplishing something; and to make impossible." Unabridged Merriam-

11   Webster.com, https://unabridged.merriam-webster.com/unabridged/prohibit (last visited

12   Sep. 9, 2023). Merriam-Webster defines "restrict" as "to set bounds or limits to" and to

13   "restrain." Unabridged Merriam-Webster.com, https://unabridged.merriam-

14   webster.com/unabridged/restrict (last visited Sep. 9, 2023). Similarly, the Oxford English

15   Dictionary defines "restrict" as "to limit." The Oxford English Dictionary,

16   https://www.oed.com/view/Entry/164018?rskey=o5HRYv&result=2#eid (last visited

17   April 11, 2023). Consistent with these dictionary definitions, the Ninth Circuit has interpreted

18   "restrict" as to "put certain limitations on." *Topa Equities, Ltd. v. City of*

19   *Los Angeles*, 342 F.3d 1065, 1070 (9th Cir. 2003) (looking to the definition in Webster's New

20   World College Dictionary). A "penalty" is defined as a "disadvantage, loss, or hardship due to

21   some action." Unabridged Merriam-Webster.com, https://unabridged.merriam-

22   webster.com/unabridged/penalty (last visited Sep. 9, 2023).

23   The heading of the relevant provision of the CRFA further informs the meaning of

24   "prohibit," "restrict, and "penalty." The heading reads, "[i]nvalidity of contracts that *impede*

25   consumer reviews." 15 U.S.C. § 45b(b) (emphasis added). "Impede" is defined as "to interfere

26   with or get in the way of the progress of." Unabridged Merriam-Webster.com,

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 15
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   https://unabridged.merriam-webster.com/unabridged/impede (last visited Sep. 14, 2023). Thus,

2   an NDA that restrains or places limits on a consumer's ability to communicate honest reviews

3   falls within the scope of "restricts" and violates the CRFA.

4        Under all of these definitions, Allure's pre-service NDAs prohibit and/or restrict

5   consumers from posting honest negative reviews. Additionally, two of Allure's pre-service

6   NDAs imposed a penalty for posting negative reviews in violation of the NDA.

7        **a.    Allure's first pre-service NDA prohibits patients from posting
            negative reviews and imposes a $250,000 penalty on patients
8           who post a negative review in violation of the agreement**

9        Under the plain, ordinary meaning of "prohibit" and "penalty," Allure's first pre-service

10  NDA violated the CRFA. This form NDA outright prohibited negative reviews and imposed

11  both an astronomical penalty of a quarter of a million dollars, as well as the threat of release of

12  a patient's HIPAA-protected private health information, for violating the agreement by posting

13  an honest negative review. It required patients to "agree to not leave a negative review or say

14  anything that would hurt the reputation of the practice." McDorman Decl., Ex. C. This

15  completely forbids patients to leave an honest negative review. *See Tennessee ex rel. Skrmetti*,

16  at *5 (concluding that a similar provision "clearly prohibits or restricts the ability of

17  a . . . customer to engage in a covered communication in violation of the CRFA"). A patient's

18  negative review is a form of "covered communication" because it is a performance assessment

19  by electronic means, on the internet, of Allure's services or conduct by the patient who is subject

20  to the agreement. This prohibition is followed by imposing a penalty of $250,000 on the patient

21  if they leave a negative review without contacting Allure and allowing them to resolve the issue.

22  McDorman Decl., Ex. C. This is the imposition of a financial loss due to engaging in covered

23  communication, leave a negative review. It forces patients to agree to pay a quarter of a million

24  dollars for violating the terms of an agreement that is already unlawful and void under federal

25  law, the CRFA. *See* 15 U.S.C. § 45b(b)(1).

26

1

  **b.**   **Allure's second pre-service NDA restricts patients from posting**
    **negative reviews and imposes monetary damages on patients**
2     **who post a negative review in violation of the agreement**

3     The second iteration of the pre-service NDA had a precondition that at the very least

4 restricted, but potentially prohibited, patients from posting honest negative reviews, and imposed

5 a penalty of monetary damages for any losses Allure suffered if consumers left a review in

6 violation of the agreement.

7     Under the plain, ordinary meaning of the terms "restrict" and "prohibit" Allure's second

8 pre-service NDA violates the CRFA because it creates preconditions that significantly limit—

9 and potentially entirely prevent—a patient's ability to otherwise freely post an honest negative

10 review. It does not take a complex or strained interpretation to determine that this NDA restricts

11 patients from posting negative reviews. It imposes preconditions through a sequence of patient

12 obligations. It requires patients to "*first . . . notify*" Allure if they have a concern and "give"

13 Allure "the opportunity to resolve the issue." McDorman Decl., Exs. D, F. (emphasis added). It

14 then requires the patient to "work with" Allure "to correct the issue *until* a resolution is reached."

15 *Id.* (emphasis added). These are unambiguous limits, restraints, on a patient's ability to otherwise

16 freely post a review about the business. "[F]irst" and "until" are common, well-understood

17 sequential time references indicating that working with Allure to resolve the issue is a

18 precondition to sharing a review. It goes further by requiring the patient to agree "not to leave a

19 review or say anything that would hurt the reputation of the practice without contacting the

20 practice of my grievance." *Id.* This is a reference to the precondition of calling Allure and

21 working with it until a resolution can be made. The form agreement goes on to define negative

22 review as "anything less than 4 starts and any negative comment(s)." *Id.* The statement that

23 Allure "recognizes" a patient's right to voice their opinions if they are dissatisfied with Allure's

24 services, *Id.*, has no effect because it is inoperative and immediately followed by the sequence

25 of obligations and preconditions restricting the patient's speech rights.

26

1   In short, Allure's second pre-service NDA imposes conditions on its patients, with clear

2   time references, that limit and restrict them from engaging in covered communication (posting

3   honest negative reviews about Allure). Interpreting such restrictive preconditions as falling

4   outside of the scope of the CRFA would be contrary to the plain language of the statute, would

5   frustrate the statutory purpose and policy objectives of the law, and would lead to absurd results,

6   leaving consumers with little recourse and undermining the remedial goals of the CRFA. *See*

7   *Williams*, 659 F.3d at 1225 ("starting point is the plain language of the statute"); *Ma v. Ashcroft*,

8   361 F.3d 553, 558 (9th Cir. 2004) ("statutory interpretations which would produce absurd results

9   are to be avoided"); *Scarborough v. Atl. Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1949)

10  (remedial statutes should be liberally construed to discourage attempted evasions

11  by wrongdoers).

12  While the State maintains that the second pre-service NDA "restricts" patient reviews,

13  which is all the CRFA requires for liability, the restriction is so limitless it could also be

14  construed to "prohibit[ ]" reviews under the language of the CRFA. *See*

15  15 U.S.C. § 45b(b)(1)(A). The second NDA requires patients to work with Allure "until a

16  resolution can be made," but does not specify how "resolution" is to be interpreted, or when, or

17  by whom. As this Court concluded in denying Allure's motion for judgment as to the third pre-

18  service NDA—which has a nearly identical precondition—the requirement to work with Allure

19  until they can reach a resolution "could plausibly be interpreted as requiring Defendants'

20  agreement that the issue has been resolved." Dkt. #22. This "edges closer to an *actual prohibition*

21  on negative reviews." *Id.* (emphasis added). This hurdle puts a consumer's freedom to post a

22  review into an indefinite, open-ended limbo unless or until Allure decides the issue is resolved.

23  A consumer's obligation to resolve the issue could be limitless. This could prevent and make it

24  impossible for a patient to post a review, meeting the definition of "prohibit." A potentially

25  infinite limit is not just a restriction, it is a prohibition.

26

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 18
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Finally, like the first pre-service NDA, this second version imposes a penalty against the

2    patient if they leave a negative review without contacting Allure and "allowing them to resolve

3    the issue." McDorman Decl., Exs. D, F. In this form contract, the penalty is "to pay monetary

4    damages to the practice for any losses." *Id.* Again, this provision imposes a financial loss due to

5    engaging in covered communication, leaving a negative review. It forces patients to agree to pay

6    an unspecified amount of damages for violating the terms of an agreement that is already

7    unlawful and void under federal law, the CRFA. *See* 15 U.S.C. § 45b(b)(1).

8                    **c.    Allure's third pre-service NDA restricts patients from posting
                           negative reviews**

9

10    Allure's third pre-service NDA again restricts and potentially prohibits patients from

11    posting negative reviews by forcing patients to agree to the same onerous and potentially

12    limitless resolution process imposed in the Second NDA. *See* McDorman Decl., Ex. E. If that

13    were not enough, the patient must initial that they "understand that calling Alderwood Surgical

14    Center is a more effective means of reaching a resolution than posting negative reviews." *Id.* The

15    form contract goes on to elaborate that "this Agreement covers all forms of media including

16    online review sites." *Id.* This sentence would be meaningless unless it is read to apply to the

17    restriction on posting negative reviews. On top of the language in the body of the agreement that

18    restricts honest negative reviews, the heading, set forth in bold at the top of the document, is

19    "**Mutual Nondisclosure Agreement**"—the restrictive meaning of which speaks for itself. *See*

20    *id.* In short, Allure's third pre-service NDA, just like the others, unlawfully restricted patients

21    from posting negative reviews.

22    In conclusion, there are no genuine issues of material fact regarding the language of

23    Allure's pre-service NDAs. Thus the Court should rule as a matter of law that: (1) all three pre-

24    service NDAs *prohibit and/or restrict* consumers from engaging in covered communication

25    (posting honest negative reviews); and (2) the first and second pre-service NDAs both impose a

26    penalty against consumers for engaging in a covered communication (posting honest negative

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 19
(2:22-cv-01835-RSM)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   reviews). As a matter of law, Allure's use of these pre-service NDAs violated the CRFA.

2   15 U.S.C. § 45b(b)(1), § 45b(c).

3                                     **V.      CONCLUSION**

4          For the foregoing reasons, the State respectfully requests that the Court grant partial

5   summary judgment to the State on its claim for Allure's liability for using these pre-service

6   NDAs from August 15, 2017 to March 24, 2022, in violation of the CRFA, 15 U.S.C. § 45b.

7          DATED this 14th day of September, 2023.

8                                              ROBERT W. FERGUSON
                                               Attorney General
9

10                                             *s/ Camille McDorman*
11                                             MATTHEW GEYMAN, WSBA #17544
                                               CAMILLE M. MCDORMAN, WSBA #53036
12                                             ZORBA LESLIE, WSBA #58523
                                               Assistant Attorneys General
13                                             Attorneys for Plaintiff State of Washington
                                               800 Fifth Avenue, Suite 2000
14                                             Seattle, WA 98104
                                               (206) 464-7744
15

16                                             *I certify that this memorandum contains 6,768*
                                               *words, in compliance with the Local Civil Rules.*
17

18

19

20

21

22

23

24

25

26

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 20
(2:22-cv-01835-RSM)

1

## <u>CERTIFICATE OF SERVICE</u>

2          I certify under penalty of perjury under the laws of the State of Washington that I caused

3   a copy of the foregoing to be served on all counsel of record via the CM/ECF system.

4          DATED this 14th day of September, 2023, at Seattle, Washington.

5

6                                   *s/ Camille McDorman*
                                    CAMILLE M. MCDORMAN
7                                   Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE DEFENDANTS'
LIABILITY UNDER CRFA FOR PRE-
SERVICE NDAS - 21
(2:22-cv-01835-RSM)