UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>ALDERWOOD SURGICAL CENTER, LLC, a Washington limited liability company; NORTHWEST NASAL SINUS CENTER P.S., a Washington professional service corporation; AND JAVAD A. SAJAN, M.D.,<br><br>Defendants. | NO. 2:22-CV-01835-RSM<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

## I.  INTRODUCTION

This matter comes before the Court on Plaintiff State of Washington's Motion for Partial Summary Judgment, Dkt #35.  The State moves for a partial finding of liability under the Consumer Review Fairness Act ("CRFA"). Defendants Alderwood Surgical Center, LLC, Northwest Nasal Sinus Center P.S., and Javad A. Sajan, M.D. (collectively "Allure Esthetic," or "Allure") oppose this Motion. Dkt. #44.  The Court has determined that it can rule without the need of oral argument.  Having reviewed the submissions of the parties, the Court GRANTS Plaintiff's Motion.

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 1

## II. BACKGROUND

Defendant Allure Esthetic is a plastic and cosmetic surgery business with offices in Lynnwood, Kirkland, and Seattle. Allure Esthetic does business under several names, including Allure Esthetic, Alderwood Surgical Center, Gallery of Cosmetic Surgery, Seattle Plastic Surgery, Northwest Nasal Sinus Center, and Northwest Face & Body. Allure Esthetic is owned and controlled by Defendant Javad A. Sajan, M.D., a plastic surgeon who advertises online, including on Instagram, Facebook, YouTube, Snapchat, and other social media, as @realdrseattle or "Real Dr. Seattle."

The State of Washington alleges that Defendants "systematically suppressed negative patient reviews by requiring their patients, before they received services (and in some cases before even having a consultation), to sign a form nondisclosure agreement (the pre-service NDA) that purported to restrict the patient's right to post truthful information about their experience with Defendants' services." Dkt. #1 at 2. This allegedly occurred from August 15, 2017, to March 24, 2022, where Defendants "required over 10,000 patients to sign these illegal NDAs…" *Id*. at 3. When patients posted negative reviews despite the pre-service NDA, Defendants allegedly contacted them and used the pre-service NDA—and the threat, or implied threat, of taking legal action to enforce it—to coerce them into taking down the negative reviews. The Complaint includes unique allegations for periods of time when different NDAs were implemented by Defendants. The State of Washington alleges that these NDAs violate the CRFA and the Washington Consumer Protection Act, RCW § 19.86.

Records show Allure required its patients to sign three different versions of pre-service NDAs from August 15, 2017, to March 24, 2022. *See* Dkt. #36 ("McDorman Decl."), Ex. A. Allure's Patient Care Coordinator from 2019 to 2021 states, "[a]s a part of the check-in process

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 2

every patient was given a stack of intake forms, including a form that talked about not posting negative reviews." Dkt. #32-15 ("Berry Decl.") at 3, ¶ 4.

The NDAs at issue clearly include language prohibiting or restricting patients from posting negative reviews. *See* McDorman Decl., Ex. C (first pre-service NDA, used from 8/15/17-8/21/17, prohibiting patients from posting any "negative review" and defining "negative review" as "anything less than 4 stars and any negative comments"); Ex. D (second pre-service NDA, used from 8/22/17-1/11/19, requiring patients to agree "not [to] leave a negative review . . . without contacting the practice of my grievance," again defining "negative review" as "anything less than 4 stars and any negative comment(s)"); Ex. E (third pre-service NDA, used from 1/12/19-3/24/22, requiring patients if they have any concerns with Allure's care or service, "First . . . to call [Allure] . . . and allow [Allure] the opportunity to resolve the issue" and "to work with [Allure] . . . to correct the issue until a resolution is reached"). The restrictions on posting negative reviews were not just theoretical but were backed up with consequences. The first two versions of the pre-service NDA required patients to agree to pay a penalty if they did post a negative review. The first required patients to agree to pay a $250,000 fine; the second required patients to agree to pay monetary damages for any losses to the business caused by a negative review. *Id.*, Ex. C and Ex. D. The third version did not mention a financial consequence. *Id.*, Ex. E. The first two versions of the pre-service NDA required patients to agree that if they violated the NDA, they would give Allure "permission and allow a response from the practice with my personal health information." *Id*.

Allure presents evidence that five patients modified the terms of these NDAs with handwritten changes and presumably went on to receive services. *See* Dkt. #47-1. Allure's COO states that "at least 227 patients elected not to sign the [NDAs]. These patients had a consultation

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 3

with a provider and many moved forward with treatment." Dkt. #47 at 2. Eventually the second and third NDAs were moved from paper to an online system where patients had to agree or click a "decline" button. *Id.*

When a patient's first appointment was a consultation with Dr. Sajan, Allure presented them with the pre-service NDA only after the patient had paid a consultation fee, according to several patients. Berry Decl., Dkt. #32-15 at 3, ¶ 6; McDorman Decl., Ex. B at 2-3 ¶¶ 4-6; Dkt. #32-2 ("Tamlyn Decl.") at 3, 5-9, ¶¶ 2-3, Ex. A, B; Dkt. #34-2 ("Hester Decl.") at 3-4, 10-13, ¶¶ 3-7, Ex. B; Dkt. #33-1 ("Lundin Decl.") at 3, 9-12 ¶¶ 6-8, Ex. B.

This case was filed on December 29, 2022. Dkt. #1. Plaintiff now moves for the Court to determine that Allure's *pre-service* NDAs from August 15, 2017, to March 24, 2022, violated the CRFA. The State reserves the question of whether *post-service* NDAs violated the CRFA, as well as its CPA and HIPAA claims and the issue of penalties and other relief for later determination by the Court. *See* Dkt. #35 at 8 n.1.

### III. DISCUSSION

**A. Legal Standard for Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 4

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B. Analysis**

The CRFA states that a provision of a form contract is "void from the inception" if the provision either "prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication" or if it "imposes a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication." 15 U.S.C. § 45b(b)(1). The CRFA defines a "form contract" as "a contract with standardized terms" that is "used by a person in the course of selling or leasing the person's goods or services"; and "imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3). In addition to voiding these contracts, the CRFA further provides that it is unlawful to offer a form contract containing one of those void provisions. 15 U.S.C. § 45b(c); *see also Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, No. 3:23-CV-00046-DCLC-JEM, 2023 WL 2299570, at *5 (E.D. Tenn. Feb. 28, 2023) (entering preliminary injunction prohibiting sales agreements preventing consumer reviews, pursuant to Tennessee Attorney General's CRFA claim).

There is no dispute as to the terms of Allure's pre-service NDAs used from August 15, 2017, to March 24, 2022. The State argues, and the Court agrees, that they were offered as

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 5

identical form contracts on a take-it-or-leave-it basis. It is indisputable that Allure's pre-service NDAs were used in the course of selling services to patients.

Allure contends their NDAs were not form contracts because a small percentage of patients modified the language with handwritten changes and because 227 patients did not sign them. Dkt. #44 at 14–15. The State correctly points out that this reflects only a tiny fraction of thousands of patients, and that the applicable standard is not whether it was *possible* to negotiate the NDAs but whether the NDAs were imposed "without a ***meaningful*** opportunity for [them] to negotiate the standardized terms." Dkt. # 49 at 8 (emphasis in original) (citing 15 U.S.C. § 45b(a)(3)(A)(ii)). To be clear, there is no dispute from the State that some patients modified the language or otherwise attempted to negotiate. There is also no genuine dispute from Allure that these forms were provided to some patients after they had paid a consultation fee. Allure offers evidence that the forms were moved online, giving patients only two options—accept or decline. The State does not need to produce hundreds of witnesses who will say that these were form contracts; they were form contracts as a matter of law under the undisputed circumstances of their creation and implementation. Allure has failed to present sufficient evidence to demonstrate a genuine dispute on this point, and to infer that patients had a *meaningful* opportunity to negotiate the NDAs, based on the undisputed facts, would be unreasonable.

The next turns to the question of whether these NDAs restricted patient reviews in violation of the CRFA.

The State contends that the terms of these NDAs "should be evaluated from the vantage point of the audience for which it was intended: an ordinary consumer." Dkt. #35 at 17–18 (analogizing this situation to that of other federal consumer protection laws). The Court agrees. From that vantage point, these contracts on their face violate the CRFA because each version

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 6

"prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication," and "impose[ ] a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication." *See* 15 U.S.C. § 45b(b)(1). There can be no reasonable debate that the first iteration prohibits patients from engaging in a covered communication and explicitly imposes a $250,000 penalty for doing so. As for the second iteration of the NDA, the State argues:

> Under the plain, ordinary meaning of the terms "restrict" and "prohibit" Allure's second pre-service NDA violates the CRFA because it creates preconditions that significantly limit— and potentially entirely prevent—a patient's ability to otherwise freely post an honest negative review. It does not take a complex or strained interpretation to determine that this NDA restricts patients from posting negative reviews. It imposes preconditions through a sequence of patient obligations. It requires patients to "first . . . notify" Allure if they have a concern and "give" Allure "the opportunity to resolve the issue." McDorman Decl., Exs. D, F. (emphasis added). It then requires the patient to "work with" Allure "to correct the issue until a resolution is reached." *Id*. (emphasis added). These are unambiguous limits, restraints, on a patient's ability to otherwise freely post a review about the business. "[F]irst" and "until" are common, well-understood sequential time references indicating that working with Allure to resolve the issue is a precondition to sharing a review. It goes further by requiring the patient to agree "not to leave a review or say anything that would hurt the reputation of the practice without contacting the practice of my grievance." *Id*. This is a reference to the precondition of calling Allure and working with it until a resolution can be made. The form agreement goes on to define negative review as "anything less than 4 starts and any negative comment(s)." *Id*. The statement that Allure "recognizes" a patient's right to voice their opinions if they are dissatisfied with Allure's services, *Id*., has no effect because it is inoperative and immediately followed by the sequence of obligations and preconditions restricting the patient's speech rights.

Dkt. #35 at 23. The Court agrees that the language above clearly "restricts" patient reviews as a matter of law. In any event, a penalty is again discussed. Like the first pre-service NDA, this second version imposes a penalty against the patient if they leave a negative review without

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 7

contacting Allure and "allowing them to resolve the issue." McDorman Decl., Exs. D, F. The penalty is "to pay monetary damages to the practice for any losses." *Id*.

Allure worded its third pre-service NDA more carefully, going so far as to call it a "Mutual Nondisclosure Agreement." McDorman Decl., Ex. E. The Court has previously found, under a Rule 12(b)(6) analysis, that:

> …the Court cannot rule as a matter of law, based on the pleadings, that the agreement at Exhibit C does not violate the CRFA. Accepting all facts alleged as true, and making all inferences in the light most favorable to the non-moving party, the Agreement could easily be construed by a fact-finder as prohibiting or restricting the ability of a consumer to communicate a negative review of Defendants' business. The Agreement asks patients to promise not to do just that without "first" agreeing to call Defendants—a restriction. The Agreement also requires patients to "agree to work with" Defendants to correct the issue "until a resolution is reached," an ambiguous phrase that could plausibly be interpreted as requiring Defendants' agreement that the issue has been resolved. This edges closer to an actual prohibition on negative reviews. It is entirely plausible that many patients (and jurors) would find such required actions awkward or onerous.

Dkt. #22 at 5. Now, viewing the evidence and drawing inferences in the light most favorable to the non-moving party, the Court nevertheless finds as a matter of law that the above language restricts patients from a covered communication by forcing dissatisfied patients to "work with" Allure "until a resolution is reached." At the very least this would delay patients from posting such reviews and force patients to interact in some way with Allure, and it certainly appears to prohibit posting reviews until Allure agrees to some kind of favorable resolution. This NDA violates the CRFA even without an explicit financial penalty. The State has clearly demonstrated a violation for all three pre-service NDAs under the CRFA.

Allure presents several affirmative defenses to avoid summary judgment. Allure argues that the implementation of the first and second NDA agreements pre-date the CRFA's

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 8

enforcement date. However, the State's enforcement powers apply to NDAs entered into before December 14, 2017, which otherwise remained "in effect on or after" that date. 15 U.S.C. § 45b(i)(2). Allure has presented no evidence that it took any step to rescind or revisit these NDAs after the CRFA's enforcement date. The Court finds this affirmative defense insufficient to defeat liability generally.

The Court likewise finds that Allure fails to present sufficient evidence to deny summary judgment based on equitable estoppel and RCW 19.86.170. *See* Dkt. #44 at 19-21. The Court has previously ruled, "equitable defenses are generally unavailable against a government agency in a civil action brought to enforce a public right or protect a public interest . . . [and] may be asserted against the government only in extraordinary cases involving 'affirmative misconduct.'" Dkt. #24 at 6 (citing *United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir. 1978)). Allure asks the Court for this relief because the Washington Medical Commission declined to open an investigation after receiving two complaints about Allure's third pre-service NDA. *See* Dkt. #44 at 19–21. Accepting this as true, it is not evidence of affirmative misconduct by the State or the Attorney General. The Court agrees with the State that the WMC had different enforcement authorities and priorities and declined to pursue complaints without analyzing the questions before the Court now. The Court also generally agrees with the State's characterization of the difference between the WMC's medical safety concerns versus the AG's consumer protection concerns. *See* Dkt. #49 at 12. The Court finds that RCW § 19.86.170 is a statutory defense to state law CPA claims, not federal CRFA claims.

Allure also moves to defer ruling on this Motion under Rule 56(d). To obtain such relief, a party "must state 'what other specific evidence it hopes to discover [and] the relevance of that evidence to its claims.'" *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (emphasis

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 9

in original; citation omitted). The party must show that "(1) it has set forth in affidavit form the *specific facts* it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Id*. (emphasis in original); *see also* Fed. R. Civ. P. 56(d). The Court finds that this relief is properly denied because Allure fails to identify any specific facts it hopes to elicit from further discovery that would be essential to opposing summary judgment. *See* Dkt. #44 at 22.[1]

Given all of the above, the Court will grant this Motion.

### IV.   CONCLUSION

Having reviewed the relevant briefing and the remainder of the record, the Court hereby finds and ORDERS that Plaintiff State of Washington's Motion for Partial Summary Judgment, Dkt #35, is GRANTED as stated above.

DATED this 12th day of April, 2024.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

---

[1] The Court notes that Allure has not brought any new facts to the Court's attention in the six months since filing its Response brief.

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – 10